RADER, Circuit Judge,
dissenting.
This court labors for page after page, paragraph after paragraph, explanation after explanation to say what could have been said in a single sentence: “Because Bilski claims merely an abstract idea, this court affirms the Board’s rejection.” If the only problem of this vast judicial tome were its circuitous path, I would not dissent, but this venture also disrupts settled and wise principles of law.
Much of the court’s difficulty lies in its reliance on dicta taken out of context from numerous Supreme Court opinions dealing with the technology of the past. In other words, as innovators seek the path to the next tech no-revolution, this court ties our patent system to dicta from an industrial age decades removed from the bleeding edge. A direct reading of the Supreme Court’s principles and cases on patent eligibility would yield the one-sentence resolution suggested above. Because this court, however, links patent eligibility to the age of iron and steel at a time of subatomic particles and terabytes, I must respectfully dissent.
I
The Patent Law of the United States has always embodied the philosophy that “ingenuity should receive a liberal encouragement.” Writings of Thomas Jefferson 75-76 (Washington ed. 1871); see also Diamond v. Chakrabarty, 447 U.S. 303, 308-09, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). True to this principle, the original Act made “any new and useful art, machine, manufacture or composition of matter” patent eligible. Act of Feb. 21, 1793, ch. 11, § 1, 1 Stat. 318 (emphasis supplied). Even as the laws have evolved, that bedrock principle remains at their foundation. Thus, the Patent Act from its inception focused patentability on the specific characteristics of the claimed invention — its novelty and utility — not on its particular subject matter category.
The modern incarnation of section 101 holds fast to that principle, setting forth the broad categories of patent eligible subject matter, and conditioning patentability on the characteristics, not the category, of the claimed invention:
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
35 U.S.C. § 101 (2006) (emphases supplied). As I have suggested, the Supreme Court requires this court to rely on the “ordinary, contemporary, common meaning” of these words. Diamond v. Diehr, 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981). If this court would follow that Supreme Court rule, it would afford broad patent protection to new and *1012 useful inventions that fall within the enumerated categories and satisfy the other conditions of patentability. That is, after all, precisely what the statute says.
In Diehr, the Supreme Court adopted a very useful algorithm for determining patentable subject matter, namely, follow the Patent Act itself. After setting forth the procedural history of that case, the Supreme Court stated: “In cases of statutory construction, we begin with the language of the statute.” Diehr, 450 U.S. at 182, 101 S.Ct. 1048. With an eye to the Benson language (so central to this court’s reasoning) that “[tjransformation and reduction of an article ‘to a different state or thing’ is the clue to the patentability of a process claim that does not include particular machines,” Gottschalk v. Benson, 409 U.S. 63, 72, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), the Court then noted:
[I]n dealing with the patent laws, we have more than once cautioned that “courts ‘should not read into the patent laws limitations and conditions which the legislature has not expressed.’ ”
Diehr, 450 U.S. at 182, 101 S.Ct. 1048 (citations omitted). Indeed section 101’s term “process” contains no hint of an exclusion for certain types of methods. This court today nonetheless holds that a process is eligible only if it falls within certain subsets of “process.” Ironically the Patent Act itself specifically defines “process” without any of these judicial innovations. 35 U.S.C. § 100(b). Therefore, as Diehr commands, this court should refrain from creating new circuitous judge-made tests.
Read in context, section 101 gives further reasons for interpretation without innovation. Specifically, section 101 itself distinguishes patent eligibility from the conditions of patentability — providing generously for patent eligibility, but noting that patentability requires substantially more. The language sweeps in “any new and useful process ... [and] any improvement.” 35 U.S.C. § 101 (emphasis supplied). As an expansive modifier, “any” embraces the broad and ordinary meanings of the term “process,” for instance. The language of section 101 conveys no implication that the Act extends patent protection to some subcategories of processes but not others. It does not mean “some” or even “most,” but all.
Unlike the laws of other nations that include broad exclusions to eligible subject matter, such as European restrictions on software and other method patents, see European Patent Convention of 1973, Art. 52(2)(e) and (3), and prohibitions against patents deemed contrary to the public morality, see id. at Art. 53(a), U.S. law and policy have embraced advances without regard to their subject matter. That promise of protection, in turn, fuels the research that, at least for now, makes this nation the world’s innovation leader.
II
With all of its legal sophistry, the court’s new test for eligibility today does not answer the most fundamental question of all: why would the expansive language of section 101 preclude protection of innovation simply because it is not transformational or properly linked to a machine (whatever that means)? Stated even more simply, why should some categories of invention deserve no protection?
This court, which reads the fine print of Supreme Court decisions from the Industrial Age with admirable precision, misses the real import of those decisions. The Supreme Court has answered the fundamental question above many times. The Supreme Court has counseled that the only limits on eligibility are inventions that embrace natural laws, natural phenomena, and abstract ideas. See, e.g., Diehr, 450 U.S. at 185, 101 S.Ct. 1048 (“This Court *1013 has undoubtedly recognized limits to § 101 and every discovery is not embraced within the statutory terms. Excluded from such patent protection are laws of nature, natural phenomena, and abstract ideas.”). In Diehr, the Supreme Court’s last pronouncement on eligibility for “processes,” the Court said directly that its only exclusions from the statutory language are these three common law exclusions: “Our recent holdings ... stand for no more than these long-established principles.” Id. at 185,101 S.Ct. 1048.
This point deserves repetition. The Supreme Court stated that all of the transformation and machine linkage explanations simply restated the abstractness rule. In reading Diehr to suggest a non-statutory transformation or preemption test, this court ignores the Court’s admonition that all of its recent holdings do no more than restate the natural laws and abstractness exclusions. Id.; see also Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204 (“Here, by contrast, the patentee has produced a new bacterium with markedly different characteristics from any found in nature and one having the potential for significant utility. His discovery is not nature’s handiwork, but his own; accordingly it is patentable subject matter under § 101.”); Parker v. Flook, 437 U.S. 584, 591-594, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“Even though a phenomenon of nature or mathematical formula may be well known, an inventive application of the principle may be patented. Conversely, the discovery of such a phenomenon cannot support a patent unless there is some other inventive concept in its application.”); In re Taner, 681 F.2d 787, 791 (C.C.P.A 1982) (“In Diehr, the Supreme Court made clear that Benson stands for no more than the long-established principle that laws of nature, natural phenomena, and abstract ideas are excluded from patent protection.”).
The abstractness and natural law preclu-sions not only make sense, they explain the purpose of the expansive language of section 101. Natural laws and phenomena can never qualify for patent protection because they cannot be invented at all. After all, God or Allah or Jahveh or Vishnu or the Great Spirit provided these laws and phenomena as humanity’s common heritage. Furthermore, abstract ideas can never qualify for patent protection because the Act intends, as section 101 explains, to provide “useful” technology. An abstract idea must be applied to (transformed into) a practical use before it qualifies for protection. The fine print of Supreme Court opinions conveys nothing more than these basic principles. Yet this court expands (transforms?) some Supreme Court language into rules that defy the Supreme Court’s own rule.
When considering the eligibility of “processes,” this court should focus on the potential for an abstract claim. Such an abstract claim would appear in a form that is not even susceptible to examination against prior art under the traditional tests for patentability. Thus this court would wish to ensure that the claim supplied some concrete, tangible technology for examination. Indeed the hedging claim at stake in this appeal is a classic example of abstractness. Bilski’s method for hedging risk in commodities trading is either a vague economic concept or obvious on its face. Hedging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class. In any event, this facially abstract claim does not warrant the creation of new eligibility exclusions.
Ill
This court’s willingness to venture away from the statute follows on the heels of an *1014 oft-discussed dissent from the Supreme Court’s dismissal of its grant of certiorari in Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 548 U.S. 124, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006). That dissent is premised on a fundamental misapprehension of the distinction between a natural phenomenon and a patentable process.
The distinction between “phenomena of nature,” “mental processes,” and “abstract intellectual concepts” is not difficult to draw. The fundamental error in that Lab. Corp. dissent is its failure to recognize the difference between a patent ineligible relationship — i.e., that between high homocy-steine levels and folate and cobalamin deficiencies — and a patent eligible process for applying that relationship to achieve a useful, tangible, and concrete result — i.e., diagnosis of potentially fatal conditions in patients. Nothing abstract here. Moreover, testing blood for a dangerous condition is not a natural phenomenon, but a human invention.
The distinction is simple but critical: A patient may suffer from the unpatentable phenomenon of nature, namely high homo-cysteine levels and low folate. But the invention does not attempt to claim that natural phenomenon. Instead the patent claims a process for assaying a patient’s blood and then analyzing the results with a new process that detects the life-threatening condition. Moreover, the sick patient does not practice the patented invention. Instead the patent covers a process for testing blood that produces a useful, concrete, and tangible result: incontrovertible diagnostic evidence to save lives. The patent does not claim the patent ineligible relationship between folate and homocy-steine, nor does it foreclose future inventors from using that relationship to devise better or different processes. Contrary to the language of the dissent, it is the sick patient who “embod[ies] only the correlation between homocysteine and vitamin deficiency,” Lab. Corp., 548 U.S. at 137, 126 S.Ct. 2921, not the claimed process.
From the standpoint of policy, the Lab. Corp. dissent avoids the same fundamental question that the Federal Circuit does not ask or answer today: Is this entire field of subject matter undeserving of incentives for invention? If so, why? In the context of Lab. Corp. that question is very telling: the natural condition diagnosed by the invention is debilitating and even deadly. See U.S. Patent No. 4,940,658, col. 1, 11. 32-40 (“Accurate and early diagnosis of cobalamin and folate deficiencies ... is important because these deficiencies can lead to life-threatening hematologic abnormalities .... Accurate and early diagnosis of cobalamin deficiency is especially important because it can also lead to incapacitating and life-threatening neuropsychiatric abnormalities.”). Before the invention featured in Lab. Corp., medical science lacked an affordable, rehable, and fast means to detect this debilitating condition. Denial of patent protection for this innovation— precisely because of its elegance and simplicity (the chief aims of all good science) — would undermine and discourage future research for diagnostic tools. Put another way, does not Patent Law wish to encourage researchers to find simple blood tests or urine tests that predict and diagnose breast cancers or immunodeficiency diseases? In that context, this court might profitably ask whether its decisions incen-tivize research for cures and other important technical advances. Without such attention, this court inadvertently advises investors that they should divert their un-protectable investments away from discovery of “scientific relationships” within the body that diagnose breast cancer or Lou Gehrig’s disease or Parkinson’s or whatever.
*1015 IV
In sum, this court today invents several circuitous and unnecessary tests. It should have merely noted that Bilski attempts to patent an abstract idea. Nothing more was needed. Instead this opinion propagates unanswerable questions: What form or amount of “transformation” suffices? When is a “representative” of a physical object sufficiently linked to that object to satisfy the transformation test? (e.g., Does only vital sign data taken directly from a patient qualify, or can population data derived in part from statistics and extrapolation be used?) What link to a machine is sufficient to invoke the “or machine” prong? Are the “specific” machines of Benson required, or can a general purpose computer qualify? What constitutes “extra-solution activity?” If a process may meet eligibility muster as a “machine,” why does the Act “require” a machine link for a “process” to show eligibility? Does the rule against redundancy itself suggest an inadequacy in this complex spider web of tests supposedly “required” by the language of section 101?
One final point, reading section 101 as it is written will not permit a flurry of frivolous and useless inventions. Even beyond the exclusion for abstractness, the final clause of section 101 — '“subject to the conditions and requirements of this title”-— ensures that a claimed invention must still satisfy the “conditions and requirements” set forth in the remainder title 35. Id. These statutory conditions and requirements better serve the function of screening out unpatentable inventions than some vague “transformation” or “proper machine link” test.
In simple terms, the statute does not mention “transformations” or any of the other Industrial Age descriptions of subject matter categories that this court endows with inordinate importance today. The Act has not empowered the courts to impose limitations on patent eligible subject matter beyond the broad and ordinary meaning of the terms process, machine, manufacture, and composition of matter. It has instead preserved the promise of patent protection for still unknown fields of invention.
Innovation has moved beyond the brick and mortar world. Even this court’s test, with its caveats and winding explanations seems to recognize this. Today’s software transforms our lives without physical anchors. This court’s test not only risks hobbling these advances, but precluding patent protection for tomorrow’s technologies. “We still do not know one thousandth of one percent of what nature has revealed to us.” Attributed to Albert Einstein. If this court has its way, the Patent Act may not incentivize, but complicate, our search for the vast secrets of nature. When all else fails, consult the statute.