MOORE, Circuit Judge,
dissenting.
Respectfully, I must dissent from the majority opinion on several grounds. I *1076 believe that the claims at issue are to a fundamental scientific principle so basic and abstract as to be unpatentable subject matter and therefore I would affirm the district court’s grant of summary judgment of invalidity under § 101. Classen claimed a monopoly over the scientific method itself. I also dissent from the majority’s refusal to reach Merck’s appeal of the denial of its motion for summary judgment of anticipation. Instead, I would affirm because the district court properly concluded that summary judgment was improper where Merck failed to offer any proof that its prior use included one of the claim elements. Finally, I dissent from the majority’s analysis of infringement and its construction of the safe harbor provision under § 271(e)(1) which is contrary to the plain language of the statute and clear Supreme Court guidance.
I. Invalidity under 35 U.S.C. § 101
In Prometheus Laboratories, Inc. v. Mayo Collaborative Services, 628 F.3d 1347, 1350 (Fed.Cir.2010), cert. granted, — U.S. -, 131 S.Ct. 3027, 180 L.Ed.2d 844 (2011), this court held the asserted claims which recited a method comprising administering a specific drug to a subject and determining the level of the drug in that subject were directed to patentable subject matter. Though both the Prometheus and Classen claims involve administering a drug (immunizing in Classen), the majority concludes that “the analogy [between Prometheus and Classen ] is inapt”. Maj. Op. at 1068. I agree. The Prometheus court explained that administered drugs “do not pass through the body untouched without affecting it,” thus “the human body necessarily undergoes a transformation.” 628 F.3d at 1356. The Prometheus court did not stop its analysis at the generality of the transformation concept. In a detailed comparison to In re Grams, 888 F.2d 835 (Fed.Cir.1989), the Prometheus court concluded that the transformative steps in the claims were not merely data gathering steps or insignificant post-solution activity. Finally, the Prometheus court concluded that the claims, which were drawn to the administration of specific drugs providing 6-thiog-uanine to a subject and then measuring specific metabolites, do not preempt broadly the use of any natural correlation, but rather recite specific treatment steps with specific drugs. 628 F.3d at 1355. None of this analysis exists in the majority opinion here in Classen. There is no consideration of the extent of preemption by these staggeringly broad and abstract claims.
The Classen claims are not directed to any specific treatment steps or drugs or even any specific chronic immune disorder. The majority concludes that the '283 patent claims are not directed to patentable subject matter, but that the claims of the '139 and '739 patents are directed to patentable subject matter. With all due respect to the majority, I see no distinction between the '283 claims and '139 and '739 claims which warrants differing treatment. Moreover, I am troubled by the majority’s conclusion that the '139 and '739 patent claims are directed to patentable subject matter without any analysis of the staggering breadth of the claims and the preemption issues inherent in claims directed to such fundamental principles.
Claim 1 of the '283 patent was designated as representative:
1. A method of determining whether an immunization schedule affects the incidence or severity of a chronic immune-mediated disorder in a treatment group of mammals, relative to a control group of mammals, which comprises immunizing mammals in the treatment group of mammals with one or more doses of one or more immunogens, according to said immunization schedule, and comparing *1077 the incidence, prevalence, frequency or severity of said chronic immune-mediated disorder or the level of a marker of such a disorder, in the treatment group, with that in the control group.
This claim requires two steps: (1) immunizing a group of mammals according to a schedule and then (2) comparing the incidence of chronic immune mediated disorder in the group to a control group.[1]
Claim 1 of the '739 patent (which is being treated as representative of the '139 and '739 patents) states:
1. A method of immunizing a mammalian subject which comprises:
(I) screening a plurality of immunization schedules, by
(a) identifying a first group of mammals and at least a second group of mammals, said mammals being of the same species, the first group of mammals having been immunized with one or more doses of one or more infectious disease-causing organism-associated immunogens according to a first screened immunization schedule, and the second group of mammals having been immunized with one or more doses of one or more infectious disease-causing organism-associated immunogens according to a second screened immunization schedule, each group of mammals having been immunized according to a different immunization schedule, and
(b) comparing the effectiveness of said first and second screened immunization schedules in protecting against or inducing a chronic immune-mediated disorder in said first and second groups, as a result of which one of said screened immunization schedules may be identified as a lower risk screened immunization schedule and the other of said screened schedules as a higher risk screened immunization schedule with regard to the risk of developing said chronic immune mediated disorder(s),
(II) immunizing said subject according to a subject immunization schedule, according to which at least one of said infectious disease-causing organism-associated immunogens of said lower risk schedule is administered in accordance with said lower risk screened immunization schedule, which administration is associated with a lower risk of development of said chronic immune-mediated disorders) than when said immunogen was administered according to said higher risk screened immunization schedule.
This claim requires two steps: (1) compare the incidence of chronic immune mediated disease in two groups of mammals who *1078 were immunized according to different schedules and then (2) immunize a mammal according to the lower risk schedule. There is virtually no difference between these two claims for the purposes of our § 101 analysis. One involves immunizing and then comparing ('283 patent); the other comparing then immunizing ('739 patent).
While I confess the precise line to be drawn between patentable subject matter and abstract idea is quite elusive, at least for me, this case is not even close. In the '283 patent, Classen claims the scientific method as applied to the field of immunization. No limitations exist on the type of drug to immunize with, the schedules that should be used for the immunization, the type of chronic immune disorder to look for, or any limitation on the control group. It is hard to imagine broader claims. It is harder to imagine a more conceptually abstract claim in the immunization area. Classen’s claims are directed to a thought apart from any concrete realities, specific objects or actual instances. This is very much like patenting E=mc[2]. Compare any two schedules to determine which one has fewer instances of immune disorders. Compare two substances to determine which one tastes sweeter. Compare two cups of coffee to determine which one is stronger. Actually, these examples are more concrete than the Classen claims in that I tell you what to look for — sweetness or strength. The Classen claims do not even specify which immune disorder should be studied. Likewise the representative claim from the '139 and '739 patents specifies no specific immune disease, drug, or schedule. These claims cover any kind of comparison between any two schedules, using any drugs and comparing the incidence of any chronic immune disease. After the user performs this completely abstract mental comparison, then the user should immunize the subject with the drug they choose on the schedule they deem lower risk.
To determine whether a claim is directed to patentable subject matter, we must look to the whole claim. Diamond v. Diehr, 450 U.S. 175, 192, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981). These claims do nothing more than suggest that two immunized groups be compared to determine which one is better. These are exactly the type of “abstract intellectual concepts” that “are the basic tools of scientific and technological work.” Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). Classen cannot escape the fundamental abstractness of his claims by limiting them to a single field of use — immunization—since “the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use ... to a particular technological environment.” Bilski v. Kappos, — U.S. -, 130 S.Ct. 3218, 3230, 177 L.Ed.2d 792 (2010) (citations omitted) (internal quotation marks omitted); id. at 3231 (“Flook established that limiting an abstract idea to one field of use ... did not make the concept patentable.”).
Although “[t]he line between a patentable ‘process’ and an unpatentable ‘principle’ is not always clear,” Parker v. Flook, 437 U.S. 584, 589, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), Classen’s claims clearly cross that line. That Classen seeks to preempt the field is readily apparent as his claims require only two steps: immunizing and comparing. Of course any researcher seeking to investigate new immunogens or immunization schedules relevant to chronic immune-mediated disorders would infringe. But a doctor might also infringe the '283 patent claim by immunizing a patient and comparing the patient’s outcome to another patient’s. Or a doctor could infringe the '739 patent claim by comparing well known schedules and then *1079 immunizing according to the one he thinks best. A patient might be liable for joint infringement by receiving an immunization, and then wondering why their friend got sick when he got the same immunization. Many other examples, each more absurd than the last, spring to mind, any one of which would result in infringement.
Having discovered a principle — that changing the timing of immunization may change the incidence of chronic immune mediated disorders — Classen now seeks to keep it for himself. In the '283 patent, he accomplishes this goal by claiming the use of the scientific method to study the incidence of chronic immune mediated disorders. This preempts the field of study, and prevents any investigation into any immunogen, known or unknown, and to any disease, known or unknown, over any period of time. Where, as here, a patent preempts an idea, a basic building block of science, within a field of study, the patent in practical effect is a patent on the idea itself. Gottschalk, 409 U.S. at 72, 93 S.Ct. 253.
The intent and effect of the Classen claims is clear: to keep others from exploring the same principle. “Patent law seeks to avoid the dangers of overprotection just as surely as it seeks to avoid the diminished incentive to invent that under-protection can threaten.” Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 548 U.S. 124, 127, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006) (Breyer, J., dissenting from dismissal of petition). Extending patent protection here would “severely interfere with, or discourage, development and the further spread of useful knowledge itself.” Id. at 128, 126 S.Ct. 2921. To wit, nobody else can search for new immunogens, for use of new immunizations, to treat either existing or currently unknown chronic immune-mediated disorders without infringing.
Classen did not invent the immunological response measured in his claim, and the discovery of this phenomenon alone “cannot support a patent unless there is some other inventive concept in its application.” Flook, 437 U.S. at 594, 98 S.Ct. 2522. Classen’s whole '283 patent claim is to the use of the scientific method by immunizing groups and comparing results. The immunization step in the '283 patent is nothing more than a data gathering step necessary to explore the effects of different immunization schedules. Classen’s whole '739 patent claim is to compare any two schedules for any drug and choose the one with fewer incidence of any chronic immune disease and then immunize. The immunization step of the '739 patent, like updating the alarm limit in Parker v. Flook, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), is nothing more than post-solution activity. As the Supreme Court explained:
The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance. A competent draftsman could attach some form of post-solution activity to almost any mathematical formula; the Pythagorean theorem would not have been patentable, or partially patentable, because a patent application contained a final step indicating that the formula, when solved could be usefully applied to existing survey techniques.
Id. at 590, 98 S.Ct. 2522. Similarly, claim 1 of the '739 patent is not directed to patentable subject matter. The post-solution immunization does not transform the unpatentable principle — that a correlation exists between vaccination schedules and incidence of chronic immune disease — into a patentable process.
*1080 “[0]ne can reduce any process to a series of steps. The question is what those steps embody. And here, aside from the unpatented test, they embody only the correlation between [immunization and the chronic immune-mediated disorder] ... that the researchers uncovered.” Lab. Corp., 548 U.S. at 137-38, 126 S.Ct. 2921. The fact that the claimed method is both useful and uses tangible tools does not change the ultimate purpose of the claim to monopolize that natural phenomenon and preempt the field of study; nor does the fact that someone must carry out the immunization to trigger the natural response which is subsequently compared to the control group. “Indeed, to use virtually any natural phenomenon for virtually any useful purpose could well involve the use of empirical information obtained through an unpatented means that might have involved transforming matter.” Id. at 136, 126 S.Ct. 2921.
The claims in this case certainly illustrate the challenge our patent system faces “in striking the balance between protecting inventors and not granting monopolies over procedures that others would discover by independent, creative application of general principles.” Bilski, 130 S.Ct. at 3228. Mr. Classen and inventors like him are not without incentives to innovate in this area. He could, of course, claim a method of treating a chronic immune-mediated disorder by using a new and specific immunization schedule. He could also claim new therapeutic immunogens which were identified as potential compounds of interest. He could even claim specific testing methods to assay and explore his new discovery. But Classen does none of this; instead he claims the study of and merely comparing whether the timing of immunization affects chronic immune-mediated disorders. “A patent is not good for an effect, or the result of a certain process, as that would prohibit all other persons from making the same thing by any means whatsoever. This, by creating monopolies, would discourage arts and manufactures, against the avowed policy of the patent laws.” Le Roy v. Tatham, 14 How. 156, 173, 14 L.Ed. 367 (1853); cf. O’Reilly v. Morse, 15 How. 62, 113, 14 L.Ed. 601 (1854) (“[W]hile he shuts the door against inventions of other persons, the patentee would be able to avail himself of new discoveries in the properties and powers of electro-magnetism which scientific men might bring to light.... The court is of opinion that the claim is too broad.... ”).
In the end, Mr. Classen’s claims seek to monopolize the process of discovery itself, albeit limited to a single field. Our patent system, however, does not award a monopoly that precludes others from using the basic procedures of scientific investigation to study the same phenomenon. See Bilski, 130 S.Ct. at 3253 (Stevens, J., concurring) (Patents on laws of nature, natural phenomena, and abstract ideas “would stifle the very progress that Congress is authorized to promote.”). Ultimately, the exceptions to patentable subject matter germane to this case rest on the “fundamental understanding that they are not the kind of ‘discoveries’ that the statute was enacted to protect.” Flook, 437 U.S. at 593, 98 S.Ct. 2522. When, as here, the claims so clearly offend the constitutional imperative to promote the useful arts, where they preempt all application of a principle or idea, it is entirely appropriate to hold them unpatentable subject matter before reaching anticipation, obviousness, or any other statutory section that might also prove invalidity.
I do not understand the distinction that the majority draws between claim 1 of the '283 patent and claim 1 of the '739 patent. Nor do I understand the test the majority proposes for determining patentability un *1081 der § 101. In reaching its conclusion that the '739 patent claims are directed to patent eligible subject matter, the majority relies heavily on Research Corp. Technologies v. Microsoft Corp., 627 F.3d 859 (Fed. Cir.2010). Research Corp. explains that claims “are not likely to be so abstract that they” recite nonstatutory subject matter if they are directed to “inventions with specific applications or improvements to technologies in the marketplace:” Id. at 869. In my view, the claimed inventions in Bilski and Flook have specific applications to the marketplace, but those claims nonetheless recite nonstatutory subject matter under § 101. Citing Research Corp. the majority holds that if the specified method is “functional and palpable,” the claims are drawn to statutory subject matter. Maj. Op. at 1066. How do we determine whether any given method or claim is “functional” or “palpable?” Is this a return to the rejected notions of “useful, concrete, and tangible?” The majority concludes that the claims of the '139 and '739 patents “are directed to a specific, tangible application” because they “includ[e] the physical step of immunization on the determined schedule.” Maj. Op. at 1066. The majority points to nothing else in the claims and does not at all consider how these staggeringly broad claims will preempt the entire immunization field from considering any two schedules prior to immunizing any patient with any drug — clearly a sweepingly broad principle. I cannot agree that this single physical immunization step makes this principle patentable subject matter.[2]
Tying an abstract idea to a tangible result or a specific field of endeavor does not make the idea any less abstract. Bilski, 130 S.Ct. at 3230. “To hold otherwise would allow a competent draftsman to evade the recognized limitations on the type of subject matter eligible for patent protection.” Diamond, 450 U.S. at 192, 101 S.Ct. 1048. The scientific method is an abstract idea, fundamental to all scientific inquiry, and must be a tool reserved to all men, regardless of its specific application. No one is entitled to patent using the scientific method to discover a cure for a newly discovered disease — undeniably a tangible result — merely because they discovered the disease itself. Classen’s claims readily illustrate that linking a natural phenomenon or abstract idea to a useful or practical result is no barrier for a competent patent drafter attempting to monopolize unpatentable subject matter. I would conclude that the Classen claims are directed to unpatentable subject matter.[3]
*1082 II. Invalidity under 35 U.S.C. § 102
I dissent from the majority’s refusal to réach Merck’s argument on appeal that it was entitled to summary judgment that the claims were invalid for anticipation. I agree that, in general, a denial of summary judgment standing alone is not immediately appealable. But here Merck properly presented us with an alternative grounds for affirming the district court’s summary judgment of invalidity, and this issue was thoroughly briefed below and decided by the district court. There is no basis upon which we could or should simply turn our back and refuse to decide an issue that is squarely before us.
In its motion for summary judgment of invalidity, Merck asserted that Classen’s claims were anticipated because a vaccination schedule for the Recombivax HB hepatitis vaccine was already in use before Classen filed his patents. The district court denied Merck’s motion for summary judgment of anticipation because Merck proffered no evidence that the correlation between immune-mediate disorders and the vaccine were evaluated as required by the representative claims. As the district court correctly noted, the '283 patent requires “immunizing a treatment group and comparing incidence of a chronic immune-mediated disorder to that of a control group.” Classen Immunotherapies v. Biogen Idec, No. WDQ-04-2607, slip op. at 8 (D.Md. Aug. 16, 2006). As the district court held, Merck did not present any evidence that there was a comparison to a control group to determine the incidence of chronic immune-mediated disorders. All Merck demonstrated was that it was using its Recombivax HB hepatitis vaccination on its 0, 1, 6 schedule prior to the Classen patents. Even if the court accepted this proposition, Merck does not demonstrate that the rest of the method was performed — there is no evidence of comparison to a control group as required by the claims. Both the '139 and '739 patents similarly “require comparing the incidence of immune-mediated disorders in treatment groups with different vaccination schedules and immunizing patients of a schedule identified as low risk.” Classen, No. WDQ-04-2607, slip op. at 9. Again, the district court correctly held that Merck offered no evidence that any comparison with different schedules or evaluation of incidence of immune-mediated disorders occurred. Merck’s proof was limited to the fact that it was immunizing on the 0, 1, 6 schedule prior to the Classen patents. This does not prove that it performed the rest of the method — the comparisons which Classen claimed. Accordingly, the district court correctly denied summary judgment. On this record, Merck failed to prove that it had performed all the steps of the method claims and therefore its prior use could not anticipate as a matter of law.
These claims are extremely broad, and Merck may well be able to offer proof of anticipation, but it failed to do so at the summary judgment stage — therefore I would affirm the district court’s denial of Merck’s summary judgment.
III. Infringement
In this case, the district court dismissed Classen’s claims against GlaxoSmithKline (GSK) and Biogen under Rule 12(b)(6), finding that the alleged uses fall into the safe harbor described by 35 U.S.C. *1083 § 271(e)(1). The majority concludes that the district court incorrectly interpreted the safe harbor of § 271(e)(1) because, according to the majority, § 271(e)(1) is limited to pre-approval activities. The majority’s construction is contrary to the plain language of the statute and Supreme Court precedent. The statute broadly recites that “[i]t shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs....” 35 U.S.C. § 271(e)(1). Nowhere does the statute limit the safe harbor to pre-approval uses.
The Supreme Court explored the boundaries of this safe harbor in Merck KGaA v. Integra Lifesciences I, Ltd., 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005), when it reversed this court’s narrow interpretation of § 271(e)(1). The Court stated that:
the statutory text makes clear that it provides a wide berth for the use of patented drugs in activities related to the federal regulatory process. As an initial matter, we think it is apparent from the statutory text that § 271(e)(l)’s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the FDCA.
Merck, 545 U.S at 202, 125 S.Ct. 2372 (emphasis in original). The Court continued, “[t]here is simply no room in the statute for excluding certain information from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included.” Id. To eliminate any lingering doubts, the Court emphasized yet a third time that “[Congress] exempted from infringement all uses of patented compounds ‘reasonably related’ to the process of developing information for submission under any federal law regulating the manufacture, use, or distribution of drugs.” Id. at 206, 125 S.Ct. 2372 (emphases in original).
While it is true that the Supreme Court decided Integra in the context of pre-approval activities, the Court repeatedly underscored the breadth of the statute’s text. Accordingly, I conclude that the safe harbor extends to all uses that are reasonably related to submitting any information under the FDCA, including information regarding post-approval uses.
The majority cites extensively from the legislative history in an attempt to justify its construction. But these citations miss the point entirely. There is no dispute that § 271(e)(1) covers pre-approval studies, as the legislative history indicates. None of the legislative history cited by the majority, nor the cases it references, speak to the question at issue here — whether the statute as enacted also covers post-approval activities. The question is not whether Congress intended to protect pre-approval activity — but whether the enacted legislation covers more than just preapproval activity. The language Congress chose to enact and that was signed into law by the President is plain on its face. There is no “pre-approval” limitation. The statute includes within the safe harbor activity “solely for uses reasonably related to the development and submission of information under a Federal law.” 35 U.S.C. § 271(e)(1). This statute could have been written to indicate solely for uses seeking federal approval or solely for pre-approval uses. It was not. The plain language of this statutory text is broader. Any activity solely for uses reasonably related to the development and submission of informa *1084 tion under a Federal law is included in § 271(e)(1).
I agree with the district court’s plain language construction of the statute, and I agree that, in this case, the alleged participation by GSK and Biogen in studies evaluating risks associated with different vaccination schedules is reasonably related to their requirement to review and report adverse information to the FDA. See, e.g., 21 C.F.R. § 601.70 (requiring annual progress reports of post-approval studies); 21 C.F.R. § 600.80 (requiring the reporting of post-approval adverse reactions). This conclusion, however, disposes of only some of the allegations against GSK and Biogen. Classen also alleges that GSK and Biogen vaccinated patients according to the patented methods, which I believe is not anchored within the statutory safe harbor.
Specifically, in Counts I, II, and IV, Classen accuses GSK of infringing through “the administration of vaccines according to the patented method[s].” Am. Compl. ¶¶ 27, 35, 51. Thus, in Counts I and II, Classen accuses GSK of screening schedules and then immunizing subjects in accordance with a lower risk schedule. In Count IV, Classen accuses GSK of determining the risk of an immunization schedule by immunizing subjects and then comparing the incidence of a disorder (i.e., an adverse event) to that in a control group. Biogen is similarly accused of “administering] the vaccines according to a [risk-reducing] protocol.” Am. Compl. ¶ 6. Although GSK and Biogen might be required to report adverse events that occur as a result of their vaccines, they are not required by law or regulation to perform such post-approval vaccinations in order to generate data. Accordingly, I conclude that these activities are not reasonably related to the development and submission of data to the FDA and therefore do not fall within § 271(e)(l)’s safe harbor exception.
The general administration of drugs or vaccines is not reasonably related to post-approval reporting requirements. For example, while the FDA requires the reporting of post-approval adverse reactions, this does not mean that all commercial uses of the vaccine are “solely for uses reasonably related to the development and submission of information under a Federal law.” The fact that GSK or Biogen would have to report to the FDA any adverse reaction after administering a vaccine does not mean the administration itself is noninfringing.
For these reasons, I would vacate the district court’s dismissal of counts I, II, and IV against GSK and Biogen because some of the alleged activities do not fall within the safe harbor of § 271(e)(1), and I would remand for further proceedings as to those parties. With respect to the district court’s grant of summary judgment of noninfringement to Merck, I agree with the majority’s affirmance because Classen failed to provide any record evidence sufficient to create a genuine issue of material fact.

. I am perplexed by the majority’s suggestion that this claim "is directed to the single step of reviewing the effects of known immunization schedules,” Maj. Op. at 1067, as the claim clearly requires immunizing mammals and then comparing the results to the known group. Moreover, the majority unfairly mischaracterizes Classen's arguments regarding the '283 patent. While Classen says "the claims of the patents in suit,” it is clear from the context that Classen is referring only to the comparison step of the '139 and '739 patents not requiring clinical trials. As that paragraph explains, the claims being discussed [the '139 and '739 claims] contain the two steps of "Step (I) screening” and "step (II)” immunizing. Moreover, the preceding paragraph clearly demonstrates his claim is that "neither the '139 nor the '739 patents require actual participation in conducting a study.” Classen Br. 40. When Classen actually references the '283 patent, he correctly describes the '283 claims as requiring "two method steps: (I) immunization and (II) comparison.” Classen Br. 7. The '283 patent claim clearly and unequivocally requires the physical act of immunization and it is unfair of the majority to analyze the claim for § 101 purposes as though it did not have that step.

. The majority explains the difference between the '283 claim (which it holds is not directed to patentable subject matter) and the '139 and '739 patent claims (which it holds are directed to patentable subject matter) as follows: "[Claim 1 of the '283 patent] stands in contrast to the '139 and '739 patent claims, which include the subsequent step of immunization on an optimal schedule." Maj. Op. at 1066.

. With all due respect to my colleagues, I do not agree with the additional views. First, the additional views improperly criticizes litigants for arguing that abstract ideas are exempt from patent protection. We are bound to follow Supreme Court precedent which clearly and explicitly holds that abstract ideas are not eligible for patent protection. Diamond, 450 U.S. at 185, 101 S.Ct. 1048 ("Excluded from such patent protection are ... abstract ideas.”); Parker, 437 U.S. at 589, 98 S.Ct. 2522 ("[A]bstract intellectual concepts are not patentable....”). Second, I favor "careful claim drafting” and think it a virtue, not a vice. If § 101 causes the drafting of careful, concrete, specific claims over abstract, conceptual claims, I see no harm. The world will have clear notice of the scope of such patent rights. Finally, in this global age, it is not immediately clear to me why the scope of patent rights should dictate the location of the innovation. Chinese companies do not move to the U.S. to carry out *1082 their research when they want a U.S. patent. Regardless, any decision on "national innovation policy” such as what will "frustrate innovation” or "drive research funding” should be left to Congress. We do not have the resources, institutional expertise or the mandate to weigh the competing incentives to innovation. Our job is to take the statute as we find it and apply it to the facts of the case before us.