Justice Stevens,
with whom
Justice Ginsburg, Justice Breyer, and Justice Sotomayor join, concurring in the judgment.
In the area of patents, it is especially important that the law remain stable and clear. The only question presented in this case is whether the so-called machine-or-transformation test is the exclusive test for what constitutes a patentable “process” under 35 U. S. C. § 101. It would be possible to answer that question simply by holding, as the entire Court agrees, that although the machine-or-transformation test is reliable in most cases, it is not the exclusive test.
I agree with the Court that, in light of the uncertainty that currently pervades this field, it is prudent to provide further guidance. But I would take a different approach. Rather than making any broad statements about how to define the term “process” in § 101 or tinkering with the bounds of the category of unpatentable, abstract ideas, I would restore patent law to its historical and constitutional moorings.
For centuries, it was considered well established that a series of steps for conducting business was not, in itself, patentable. In the late 1990’s, the Federal Circuit and others called this proposition into question. Congress quickly responded to a Federal Circuit decision with a stopgap measure designed to limit a potentially significant new problem for the business community. It passed the First Inventor Defense Act of 1999 (1999 Act), 113 Stat. 1501A-555 (codified at 35 U. S. C. § 273), which provides a limited defense to claims of patent infringement, see § 273(b), for “method[s] of *614 doing or conducting business,” § 273(a)(3). Following several more years of confusion, the Federal Circuit changed course, overruling recent decisions and holding that a series of steps may constitute a patentable process only if it is tied to a machine or transforms an article into a different state or thing. This “machine-or-transformation test” excluded general methods of doing business as well as, potentially, a variety of other subjects that could be called processes.
The Court correctly holds that the machine-or-transformation test is not the sole test for what constitutes a patentable process; rather, it is a critical clue.[1] But the Court is quite wrong, in my view, to suggest that any series of steps that is not itself an abstract idea or law of nature may constitute a “process” within the meaning of § 101. The language in the Court’s opinion to this effect can only cause mischief. The wiser course would have been to hold that petitioners’ method is not a “process” because it describes only a general method of engaging in business transactions— and business methods are not patentable. More precisely, although a process is not patent ineligible simply because it is useful for conducting business, a claim that merely describes a method of doing business does not qualify as a “process” under § 101.
I
Although the Court provides a brief statement of facts, ante, at 597-601, a more complete explication may be useful for those unfamiliar with petitioners’ patent application and this case’s procedural history.
Petitioners’ patent application describes a series of steps for managing risk amongst buyers and sellers of commodities. The general method, described in claim 1, entails *615 “managing the consumption risk costs of a commodity sold by a commodity provider at a fixed price,” and consists of the following steps:
“(a) initiating a series of transactions between said commodity provider and consumers of said commodity wherein said consumers purchase said commodity at a fixed rate based upon historical averages, said fixed rate corresponding to a risk position of said consumers;
“(b) identifying market participants for said commodity having a counter-risk position to said consumers; and
“(c) initiating a series of transactions between said commodity provider and said market participants at a second fixed rate such that said series of market participant transactions balances the risk position of said series of consumer transactions.” App. 19-20.
Although the patent application makes clear that the “method can be used for any commodity to manage consumption risk in a fixed bill price product,” id., at 11, it includes specific applications of the method, particularly in the field of energy, as a means of enabling suppliers and consumers to minimize the risks resulting from fluctuations in demand during specified time periods, see id., at 20-22. Energy suppliers and consumers may use that method to hedge their risks by agreeing upon a fixed series of payments at regular intervals throughout the year instead of charging or paying prices that fluctuate in response to changing weather conditions. The patent application describes a series of steps, including the evaluation of historical costs and weather variables and the use of economic and statistical formulas, to analyze these data and to estimate the likelihood of certain outcomes. See id., at 12-19.
The patent examiner rejected petitioners’ application on the ground that it “is not directed to the technological arts,” insofar as it “is not implemented on a specific apparatus and merely manipulates [an] abstract idea and solves a purely *616 mathematical problem without any limitation to a practical application.” App. to Pet. for Cert. 148a.
The Board of Patent Appeals and Interferences affirmed the examiner’s decision, but it rejected the position that a patentable process must relate to “technological arts” or be performed on a machine. Id., at 180a-181a. Instead, the Board denied petitioners’ patent on two alternative, although similar, grounds: first, that the patent involves only mental steps that do not transform physical subject matter, id., at 181a-184a; and, second, that it is directed to an “abstract idea,” id., at 184a-187a.
Petitioners appealed to the United States Court of Appeals for the Federal Circuit. After briefing and argument before a three-judge panel, the court sua sponte decided to hear the case en banc and ordered the parties to address: (1) whether petitioners’ “claim 1 . . . claims patent-eligible subject matter under 35 U. S. C. § 101”; (2) “fwjhat standard should govern in determining whether a process is patent-eligible subject matter”; (3) “[wjhether the claimed subject matter is not patent-eligible because it constitutes an abstract idea or mental process”; (4) “[wjhether a method or process must result in a physical transformation of an article or be tied to a machine to be patent-eligible subject matter”; and (5) whether the court’s decisions in State Street Bank & Trust Co. v. Signature Financial Group, Inc., 149 F. 3d 1368 (1998) (State Street), and AT&T Corp. v. Excel Communications, Inc., 172 F. 3d 1352 (1999), should be overruled in any respect. App. to Pet. for Cert. 144a-145a.
The en banc Court of Appeals affirmed the Board’s decision. Eleven of the twelve judges agreed that petitioners’ claims do not describe a patentable “process,” § 101. Chief Judge Michel’s opinion, joined by eight other judges, rejected several possible tests for what is a patent-eligible process, including whether the patent produces a “ ‘useful, concrete and tangible result,’” whether the process relates to “technological arts,” and “categorical exclusions” for certain proc *617 esses such as business methods. In re Bilski, 545 F. 3d 943, 959-960 (2008). Relying on several of our cases in which we explained how to differentiate a claim on a “fundamental principle” from a claim on a “process,” the court concluded that a “claimed process is surely patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.” Id., at 954-955. The court further concluded that this “machine-or-transformation test” is “the sole test governing §101 analyses,” id., at 955 (emphasis added), and therefore the “test for determining patent eligibility of a process under §101,” id., at 956. Applying that test, the court held that petitioners’ claim is not a patent-eligible process. Id., at 963-966.
In a separate opinion reaching the same conclusion, Judge Dyk carefully reviewed the history of American patent law and English precedents upon which our law is based, and found that “the unpatentability of processes not involving manufactures, machines, or compositions of matter has been firmly embedded . . . since the time of the Patent Act of 1793.” Id., at 966. Judge Dyk observed, moreover, that “[t]here is no suggestion in any of this early consideration of process patents that processes for organizing human activity were or ever had been patentable.” Id., at 972.
Three judges wrote dissenting opinions, although two of those judges agreed that petitioners’ claim is not patent eligible. Judge Mayer would have held that petitioners’ claim “is not eligible for patent protection because it is directed to a method of conducting business.” Id., at 998. He submitted that “[t]he patent system is intended to protect and promote advances in science and technology, not ideas about how to structure commercial transactions.” Ibid. “Affording patent protection to business methods lacks constitutional and statutory support, serves to hinder rather than promote innovation!,] and usurps that which rightfully belongs in the public domain.” Ibid.
*618 Judge Rader would have rejected petitioners’ claim on the ground that it seeks to patent merely an abstract idea. Id., at 1011.
Only Judge Newman disagreed with the court’s conclusion that petitioners’ claim seeks a patent on ineligible subject matter. Judge Newman urged that the en banc court’s machine-or-transformation test ignores the text and history of § 101, id., at 977-978, 985-990, is in tension with several decisions by this Court, id., at 978-985, and the Federal Circuit, id., at 990-992, and will invalidate thousands of patents that were issued in reliance on those decisions, id., at 992-994
Before explaining in more detail how I would decide this case, I will comment briefly on the Court’s opinion. The opinion is less than pellucid in more than one respect, and, if misunderstood, could result in confusion or upset settled areas of the law. Three preliminary observations may be clarifying.
First, the Court suggests that the terms in the Patent Act must be read as lay speakers use those terms, and not as they have traditionally been understood in the context of patent law. See, e. g., ante, at 603 (terms in § 101 must be viewed in light of their “‘ordinary, contemporary, common meaning’ ”); ante, at 607 (patentable “method” is any “orderly procedure or process,” “regular way or manner of doing anything,” or “set form of procedure adopted in investigation or instruction” (internal quotation marks omitted)). As I will explain at more length in Part III, infra, if this portion of the Court’s opinion were taken literally, the results would be absurd: Anything that constitutes a series of steps would be patentable so long as it is novel, nonobvious, and described with specificity. But the opinion cannot be taken literally on this point. The Court makes this clear when it accepts that the “atextual” machine-or-transformation test, ante, at 609, is “useful and important,” ante, at 604, even though it *619 “violates” the stated “statutory interpretation principles,” ante, at 603; and when the Court excludes processes that tend to pre-empt commonly used ideas, see ante, at 610-611.
Second, in the process of addressing the sole issue presented to us, the opinion uses some language that seems inconsistent with our centuries-old reliance on the machine- or-transformation criteria as clues to patentability. Most notably, the opinion for a plurality suggests that these criteria may operate differently when addressing technologies of a recent vintage. See ante, at 605 (machine-or-transformation test is useful “for evaluating processes similar to those in the Industrial Age,” but is less useful “for determining the patentability of inventions in the Information Age”). In moments of caution, however, the opinion for the Court explains — correctly—that the Court is merely restoring the law to its historical state of rest. See ante, at 604 (“This Court’s precedents establish that the machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under §101”). Notwithstanding this internal tension, I understand the Court’s opinion to hold only that the machine-or-transformation test remains an important test for patentability. Few, if any, processes cannot effectively be evaluated using these criteria.
Third, in its discussion of an issue not contained in the questions presented — whether the particular series of steps in petitioners’ application is an abstract idea — the Court uses language that could suggest a shift in our approach to that issue. Although I happen to agree that petitioners seek to patent an abstract idea, the Court does not show how this conclusion follows “clearfly],” ante, at 611, from our case law. The patent now before us is not for “[a] principle, in the abstract,” or a “fundamental truth.” Parker v. Flook, 437 U. S. 584, 589 (1978) (internal quotation marks omitted). Nor does it claim the sort of phenomenon of nature or abstract idea that was embodied by the mathematical formula *620 at issue in Gottschalk v. Benson, 409 U. S. 63, 67 (1972), and in Flook.
The Court construes petitioners’ claims on processes for pricing as claims on “the basic concept of hedging, or protecting against risk,” ante, at 611, and thus discounts the application’s discussion of what sorts of data to use, and how to analyze those data, as mere “token postsolution components,” ante, at 612. In other words, the Court artificially limits petitioners’ claims to hedging, and then concludes that hedging is an abstract idea rather than a term that describes a category of processes including petitioners’ claims. Why the Court does this is never made clear. One might think that the Court’s analysis means that any process that utilizes an abstract idea is itself an unpatentable, abstract idea. But we have never suggested any such rule, which would undermine a host of patentable processes. It is true, as the Court observes, that petitioners’ application is phrased broadly. See ante, at 611-612. But claim specification is covered by § 112, not § 101; and if a series of steps constituted an unpatentable idea merely because it was described without sufficient specificity, the Court could be calling into question some of our own prior decisions.[2] At points, the opinion suggests that novelty is the clue. See ante, at 610-611. But the fact that hedging is “ ‘long prevalent in our system of commerce,’” ante, at 611, cannot justify the Court’s conclusion, as “the proper construction of §101 . . . does not involve the familiar issu[e] of novelty” that arises under § 102, Flook, 437 U. S., at 588. At other points, the opinion for a plurality suggests that the analysis turns on the category of patent involved. See, e. g., ante, at 608 (courts *621 should use the abstract-idea rule as a “too[l]” to set “a high enough bar” “when considering patent applications of this sort”). But we have never in the past suggested that the inquiry varies by subject matter.
The Court, in sum, never provides a satisfying account of what constitutes an unpatentable abstract idea. Indeed, the Court does not even explain if it is using the maehine-ortransformation criteria. The Court essentially asserts its conclusion that petitioners’ application claims an abstract idea. This mode of analysis (or lack thereof) may have led to the correct outcome in this case, but it also means that the Court’s musings on this issue stand for very little.
Ill
I agree with the Court that the text of § 101 must be the starting point of our analysis. As I shall explain, however, the text must not be the end point as well.
Pursuant to its power “[t]o promote the Progress of . . . useful Arts, by securing for limited Times to . . . Inventors the exclusive Right to their . . . Discoveries,” U. S. Const., Art. I, § 8, cl. 8, Congress has passed a series of patent laws that grant certain exclusive rights over certain inventions and discoveries as a means of encouraging innovation. In the latest iteration, the Patent Act of 1952 (1952 Act), Congress has provided that “[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title,” 35 U. S. C. § 101, which include that the patent also be novel, § 102, and nonobvious, § 103. The statute thus authorizes four categories of subject matter that may be patented: processes, machines, manufactures, and compositions of matter. Section 101 imposes a threshold condition. “[N]o patent is available for a discovery, however useful, novel, and nonobvious, unless it falls within one of the express categories of patentable subject matter.” Kewanee Oil Co. v. Bicron Corp., 416 U. S. 470, 483 (1974).
*622 Section 101 undoubtedly defines in “expansive terms” the subject matter eligible for patent protection, as the statute was meant to ensure that “ ‘ingenuities] receive a liberal encouragement.’” Diamond v. Chakrabarty, 447 U. S. 303, 308-309 (1980); see also J. E. M. Ag Supply, Inc. v. Pioneer Hi-Bred Int’l, Inc., 534 U. S. 124, 130 (2001). Nonetheless, not every new invention or discovery may be patented. Certain things are “free for all to use.” Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U. S. 141, 151 (1989).[3]
The text of the Patent Act does not on its face give much guidance about what constitutes a patentable process. The statute defines the term “process” as a “process, art or method [that] includes a new use of a known process, machine, manufacture, composition of matter, or material.” § 100(b). But, this definition is not especially helpful, given that it also uses the term “process” and is therefore somewhat circular.
As lay speakers use the word “process,” it constitutes any series of steps. But it has always been clear that, as used in § 101, the term does not refer to a “ ‘process’ in the ordinary sense of the word,” Flook, 437 U. S., at 588; see also Corning v. Burden, 15 How. 252, 268 (1854) (“[T]he term process is often used in a more vague sense, in which it can *623 not be the subject of a patent”). Rather, as discussed in some detail in Part IV, infra, the term “process” (along with the definitions given to that term) has long accumulated a distinctive meaning in patent law. When the term was used in the 1952 Act, it was neither intended nor understood to encompass any series of steps or any way to do any thing.
With that understanding in mind, the Government has argued that because “a word” in a statute “is given more precise content by the neighboring words with which it” associates, United States v. Williams, 553 U. S. 285, 294 (2008), we may draw inferences from the fact that “[t]he other three statutory categories of patent-eligible subject matter identified in Section 101 — ‘machine, manufacture, or composition of matter’ — all ‘are things made by man, and involve technology.’” Brief for Respondent 26. Specifically, the Government submits, we may infer “that the term ‘process’ is limited to technological and industrial methods.” Ibid. The Court rejects this submission categorically, on the ground that “§ 100(b) already explicitly defines the term ‘process.’ ” Ante, at 604. But § 100(b) defines the term “process” by using the term “process,” as well as several other general terms. This is not a case, then, in which we must either “follow” a definition, ibid., or rely on neighboring words to understand the scope of an ambiguous term. The definition itself contains the very ambiguous term that we must define.
In my view, the answer lies in between the Government’s and the Court’s positions: The terms adjacent to “process” in § 101 provide a clue as to its meaning, although not a very strong clue. Section 101’s list of categories of patentable subject matter is phrased in the disjunctive, suggesting that the term “process” has content distinct from the other items in the list. It would therefore be illogical to “rob” the word “process” of all independent meaning. Reiter v. Sonotone Corp., 442 U. S. 330, 338 (1979). Moreover, to the extent we can draw inferences about what is a “process” from common attributes in § 101, it is a dangerous endeavor to do so on the *624 basis of a perceived overarching theme. Given the many moving parts at work in the Patent Act, there is a risk of merely confirming our preconceived notions of what should be patentable or of seeing common attributes that track “the familiar issues of novelty and obviousness” that arise under other sections of the statute but are not relevant to § 101, Flook, 437 U. S., at 588. The placement of “process” next to other items thus cannot prove that the term is limited to any particular categories; it does, however, give reason to be skeptical that the scope of a patentable “process” extends to cover any series of steps at all.
The Court makes a more serious interpretive error. As briefly discussed in Part II, supra, the Court at points appears to reject the well-settled proposition that the term “process” in § 101 is not a “ ‘process’ in the ordinary sense of the word,” Flook, 437 U. S., at 588. Instead, the Court posits that the word “process” must be understood in light of its “ordinary, contemporary, common meaning,” ante, at 603 (internal quotation marks omitted). Although this is a fine approach to statutory interpretation in general, it is a deeply flawed approach to a statute that relies on complex terms of art developed against a particular historical background.[4] Indeed, the approach would render § 101 almost comical. A process for training a dog, a series of dance steps, a method of shooting a basketball, maybe even words, stories, or songs if framed as the steps of typing letters or uttering sounds— all would be patent eligible. I am confident that the term “process” in § 101 is not nearly so capacious.[5]
*625 So is the Court, perhaps. What is particularly incredible about the Court’s stated method of interpreting § 101 (other than that the method itself may be patent eligible under the Court’s theory of § 101) is that the Court deviates from its own professed commitment to “ordinary, contemporary, common meaning.” As noted earlier, the Court accepts a role for the “atextual” machine-or-transformation “clue.” Ante, at 609, 604. The Court also accepts that we have “foreclose[d] a purely literal reading of § 101,” Flook, 437 U. S., at 589, by holding that claims that are close to “laws of nature, natural phenomena, and abstract ideas,” Diamond v. Diehr, 450 U. S. 175, 185 (1981), do not count as “processes” under §101, even if they can be colloquially described as such.[6] The Court attempts to justify this latter exception to § 101 as “a matter of statutory stare decisis.” Ante, at 602. But it is strange to think that the very same term must be interpreted literally on some occasions, and in light of its historical usage on others.
In fact, the Court’s understanding of § 101 is even more remarkable because its willingness to exclude general principles from the provision’s reach is in tension with its apparent willingness to include steps for conducting business. The history of patent law contains strong norms against *626 patenting these two categories of subject matter. Both norms were presumably incorporated by Congress into the 1952 Act.
IV
Because the text of § 101 does not on its face convey the scope of patentable processes, it is necessary, in my view, to review the history of our patent law in some detail. This approach yields a much more straightforward answer to this case than the Court’s. As I read the history, it strongly supports the conclusion that a method of doing business is not a “process” under § 101.
I am, of course, mindful of the fact that § 101 “is a dynamic provision designed to encompass new and unforeseen inventions,” and that one must therefore view historical conceptions of patent-eligible subject matter at an appropriately high level of generality. J. E. M. Ag Supply, 534 U. S., at 135; see also Chakmbarty, 447 U. S., at 315-316. But it is nonetheless significant that while people have long innovated in fields of business, methods of doing business fall outside of the subject matter that has “historically been eligible to receive the protection of our patent laws,” Diehr, 450 U. S., at 184, and likely go beyond what the modern patent “statute was enacted to protect,” Flook, 437 U. S., at 593. It is also significant that when Congress enacted the 1952 Act, it did so against the background of a well-settled understanding that a series of steps for conducting business cannot be patented. These considerations ought to guide our analysis. As Justice Holmes noted long ago, sometimes, “a page of history is worth a volume of logic.” New York Trust Co. v. Eisner, 256 U. S. 345, 349 (1921).

English Backdrop

The Constitution’s Patent Clause was written against the “backdrop” of English patent practices, Graham v. John Deere Co. of Kansas City, 383 U. S. 1, 5 (1966), and early American patent law was “largely based on and incorpo *627 rated” features of the English patent system, E. Walterscheid, To Promote the Progress of Useful Arts: American Patent Law and Administration, 1798-1836, p. 109 (1998) (hereinafter Walterscheid, To Promote the Progress).[7] The governing English law, the Statute of Monopolies, responded to abuses whereby the Crown would issue letters patent, “granting monopolies to court favorites in goods or businesses which had long before been enjoyed by the public.” Graham, 383 U. S., at 5. The statute generally prohibited the Crown from granting such exclusive rights, 21 Jam. 1, ch. 3, § 1 (1623), in 4 Statutes of the Realm 1213, but it contained exceptions that, inter alia, permitted grants of exclusive rights to the “working or makinge of any manner of new Manufactures,” §6.
Pursuant to that provision, patents issued for the “mode, method, or way of manufacturing,” P. Campin, Law of Patents for Inventions 11 (1869) (emphasis deleted), and English courts construed the phrase “working or makinge of any manner of new Manufactures” to encompass manufacturing processes, see, e. g., Boulton v. Bull, 2 H. Bl. 463, 471, 492, 126 Eng. Rep. 651, 655, 666 (C. P. 1795) (holding that the term “manufacture” “applied not only to things made, but to the practice of making, to principles carried into practice in a new manner, to new results of principles carried into practice”). Thus, English courts upheld James Watt’s famous patent on a method for reducing the consumption of fuel in steam engines,[8] as well as a variety of patents issued for *628 methods of synthesizing substances or building mechanical devices.[9]
Although it is difficult to derive a precise understanding of what sorts of methods were patentable under English law, there is no basis in the text of the Statute of Monopolies, nor in pre-1790 English precedent, to infer that business methods could qualify.[10] There was some debate throughout the relevant time period about what processes could be patented. But it does not appear that anyone seriously believed that one could patent “a method for organizing human activity.” 545 F. 3d, at 970 (Dyk, J., concurring).[11]
There were a small number of patents issued between 1623 and 1790 relating to banking or lotteries and one for a method of life insurance,[12] but these did not constitute the “prevailing]” “principles and practice” in England on which our patent law was based, Pennock v. Dialogue, 2 Pet. 1, 18 (1829). Such patents were exceedingly rare, and some of *629 them probably were viewed not as inventions or discoveries but rather as special state privileges[13] that until the mid-1800’s were recorded alongside inventions in the patent records, see MacLeod 1-2 (explaining that various types of patents were listed together). It appears that the only English patent of the time that can fairly be described as a business method patent was one issued in 1778 on a “Plan for assurances on lives of persons from 10 to 80 years of Age.” Woodcroft 324.[14] And “[t]here is no indication” that this patent “was ever enforced or its validity tested,” 545 F. 3d, at 974 (Dyk, J., concurring); the patent may thus have represented little more than the whim — or error — of a single patent clerk.[15]
In any event, these patents (or patent) were probably not known to the Framers of early patent law. In an era before computerized databases, organized ease law, and treatises,[16] the American drafters probably would have known about particular patents only if they were well publicized or sub *630 ject to reported litigation. So far as I am aware, no published cases pertained to patents on business methods.
Also noteworthy is what was not patented under the English system. During the 17th and 18th centuries, Great Britain saw innovations in business organization,[17] business models,[18] management techniques,[19] and novel solutions to the challenges of operating global firms in which subordinate managers could be reached only by a long sea voyage.[20] New if any of these methods of conducting business were patented.[21]

Early American Patent Law

At the Constitutional Convention, the Founders decided to give Congress a patent power so that it might “promote the Progress of . . . useful Arts.” Art. I, §8, cl. 8. There is *631 little known history of that Clause.[22] We do know that the Clause passed without objection or debate.[23] This is striking because other proposed powers, such as a power to grant charters of incorporation, generated discussion about the fear that they might breed “monopolies.”[24] Indeed, at the ratification conventions, some States recommended amendments that would have prohibited Congress from granting “ 'exclusive advantages of commerce.’ ”[25] If the original understanding of the Patent Clause included the authority to patent methods of doing business, it might not have passed so quietly.
In 1790, Congress passed the first Patent Act, an “Act to promote the progress of useful Arts” that authorized patents for persons who had “invented or discovered any useful art, manufacture, engine, machine, or device, or any improvement therein not before known or used,” if “the invention or discovery [was] sufficiently useful and important.” 1 Stat. 109-110. Three years later, Congress passed the Patent Act *632 of 1793 and slightly modified the language to cover “any new and useful art, machine, manufacture or composition of matter, or any new and useful improvement on any art, machine, manufacture or composition of matter.” 1 Stat. 319.
The object of the constitutional patent power and the statutory authorization for process patents in the early patent Acts was the term “useful art.” It is not evident from the face of the statutes or the Constitution whether the objects of the patent system were “arts” that are also useful, or rather a more specific category, the class of arts known as “useful arts.” Cf. Graham, 383 U. S., at 12 (describing the “'new and useful’ tests which have always existed in the statutory scheme” and apply to all categories of subject matter). However, we have generally assumed that “useful art,” at least as it is used in the Patent Act, is itself a term of art. See Burden, 15 How., at 267-268.
The word “art” and the phrase “useful arts” are subject to many meanings. There is room on the margins to debate exactly what qualifies as either. There is room, moreover, to debate at what level of generality we should understand these broad and historical terms, given that “[a] rule that unanticipated inventions are without protection would conflict with the core concept of the patent law,” Chakrabarty, 447 U. S., at 316. It appears, however, that regardless of how one construes the term “useful arts,” business methods are not included.
Noah Webster’s first American dictionary[26] defined the term “art” as the “disposition or modification of things by *633 human skill, to answer the purpose intended,” and differentiated between “useful or mechanic” arts, on the one hand, and “liberal or polite” arts, on the other. 1 An American Dictionary of the English Language (1828) (facsimile edition) (emphasis added). Although other dictionaries defined the word “art” more broadly,[27] Webster’s definition likely conveyed a message similar to the meaning of the word “manufactures” in the earlier English statute. And we know that the term “useful arts” was used in the founding era to refer to manufacturing and similar applied trades.[28] See Coulter, The Field of the Statutory Useful Arts, 34 J. Pat. Off. Soc. 487, 493-500 (1952); see also Thomas, The Patenting of the Liberal Professions, 40 Boston College L. Rev. 1139, 1164 (1999) (“[The Framers of the Constitution] undoubtedly contemplated the industrial, mechanical and manual arts of the late eighteenth century, in contrast to the seven ‘liberal arts’ and the four ‘fine arts’ of classical learning”). Indeed, just *634 days before the Constitutional Convention, one delegate listed examples of American progress in “manufactures and the useful arts,” all of which involved the creation or transformation of physical substances. See T. Coxe, An Address to an Assembly of the Friends of American Manufactures 17-18 (1787) (listing, inter alia, meal, ships, liquors, potash, gunpowder, paper, starch, articles of iron, stone work, carriages, and harnesses). Numerous scholars have suggested that the term “useful arts” was widely understood to encompass the fields that we would now describe as relating to technology or “technological arts.”[29]
Thus, fields such as business and finance were not generally considered part of the “useful arts” in the founding era. See, e. g., The Federalist No. 8, p. 69 (C. Rossiter ed. 1961) (A. Hamilton) (distinguishing between “the arts of industry, and the science of finance”); 30 The Writings of George *635 Washington 1745-1799, p. 186 (J. Fitzpatrick ed. 1939) (writing in a letter that “our commerce has been considerably-curtailed,” but “the useful arts have been almost imperceptibly pushed to a considerable degree of perfection”). Indeed, the same delegate to the Constitutional Convention who gave an address in which he listed triumphs in the useful arts distinguished between those arts and the conduct of business. He explained that investors were now attracted to the “manufactures and the useful arts,” much as they had long invested in “commerce, navigation, stocks, banks, and insurance companies.” T. Coxe, A Statement of the Arts and Manufactures of the United States of America for the Year 1810 (1814), in 2 American State Papers, Finance 666, 688 (1832).
Some scholars have remarked, as did Thomas Jefferson, that early patent statutes neither included nor reflected any serious debate about the precise scope of patentable subject matter. See, e. g., Graham, 383 U. S., at 9-10 (discussing Thomas Jefferson’s observations). It has been suggested, however, that “[p]erhaps this was in part a function of an understanding — shared widely among legislators, courts, patent office officials, and inventors — about what patents were meant to protect. Everyone knew that manufactures and machines were at the core of the patent system.” Merges, Property Rights for Business Concepts and Patent System Reform, 14 Berkeley Tech. L. J. 577, 585 (1999) (hereinafter Merges). Thus, although certain processes, such as those related to the technology of the time, might have been considered patentable, it is possible that “[ajgainst this background, it would have been seen as absurd for an entrepreneur to file a patent” on methods of conducting business. Ibid.

Development of American Patent Law

During the first years of the patent system, no patents were issued on methods of doing business.[30] Indeed, for *636 some time, there were serious doubts as to “the patentability of processes per se,” as distinct from the physical end product or the tools used to perform a process. Id., at 581-582.[31]
Thomas Jefferson was the “ 'first administrator of our patent system’ ” and “the author of the 1793 Patent Act.” Graham, 383 U. S., at 7. We have said that his “conclusions as to conditions for patentability ... are worthy of note.” Ibid. During his time administering the system, Jefferson “saw clearly the difficulty” of deciding what should be patentable.[32] Id., at 9. He drafted the 1793 Act, id., at 7, and, years later, explained that in that Act '"the whole was turned over to the judiciary, to be matured into a system, under which every one might know when his actions were safe and lawful,’ ” id., at 10 (quoting Letter to Issac McPherson, in VI Writings of Thomas Jefferson 181-182 (H. Washington ed. 1861)). As the Court has explained, “Congress agreed with Jefferson . . . that the courts should develop additional conditions for patentability.” Graham, 383 U. S., at 10. Thus "[a]lthough the Patent Act was amended, revised or codified some 50 times between 1790 and 1950, Congress steered clear” of adding statutory requirements of patentability. Ibid. For nearly 160 years, Congress retained the term “useful arts,” see, e. g., Act of July 4,1836, ch. 357, 5 Stat. 117, leaving “wide latitude for judicial construction . . . to keep pace with industrial development,” Berman, Method Claims, 17 J. Pat. Off. Soc. 713, 714 (1935) (hereinafter Berman).
*637 Although courts occasionally struggled with defining what was a patentable “art” during those 160 years, they consistently rejected patents on methods of doing business. The rationales for those decisions sometimes varied. But there was an overarching theme, at least in dicta: Business methods are not patentable arts. See, e. g., United States Credit System Co. v. American Credit Indemnity Co., 53 F. 818, 819 (CCNY 1893) (“method of insuring against loss by bad debts” could not be patented “as an art”); Hotel Security Checking Co. v. Lorraine Co., 160 F. 467, 469 (CA2 1908) (“A system of transacting business disconnected from the means for carrying out the system is not, within the most liberal interpretation of the term, an art”); Guthrie v. Curlett, 10 F. 2d 725, 726 (CA2 1926) (method of abbreviating rail tariff schedules, “if it be novel, is not the kind of art protected by the patent acts”); In re Patton, 127 F. 2d 324, 327-328 (CCPA 1942) (holding that novel “ 'interstate and national fire-fighting system’ ” was not patentable because, inter alia, “a system of transacting business, apart from the means for carrying out such system, is not” an art within the meaning of the patent law, “nor is an abstract idea or theory, regardless of its importance or . . . ingenuity”); Loew’s Drive-In Theatres, Inc. v. Park-In Theatres, Inc., 174 F. 2d 547, 552 (CA1 1949) (“[A] system for the transaction of business, such, for example, as the cafeteria system for transacting the restaurant business . . . however novel, useful, or commercially successful is not patentable apart from the means for making the system practically useful, or carrying it out”); Joseph E. Seagram & Sons, Inc. v. Marzall, 180 F. 2d 26, 28 (CADC 1950) (method of focus-group testing for beverages is not patentable subject matter); see also In re Howard, 394 F. 2d 869, 872 (CCPA 1968) (Kirkpatrick, J., concurring) (explaining that a “method of doing business” cannot be patented). Between 1790 and 1952, this Court never addressed the patentability of business methods. But we consistently focused the inquiry on whether an “art” was connected to a machine or physical *638 transformation,[33] an inquiry that would have excluded methods of doing business.
By the early 20th century, it was widely understood that a series of steps for conducting business could not be patented. A leading treatise, for example, listed “ ‘systems’ of business” as an “unpatentable subjec[t].” 1 A. Deller, Walker on Patents § 18, p. 62 (1937).[34] Citing many of the cases listed above, the treatise concluded that a “method of transacting business” is not an “‘art.’” Id., §22, at 69; see also L. Amdur, Patent Law and Practice §39, p. 53 (1935) (listing “Methods of doing business” as an “Unpatentable [A]r[t]”); Berman 718 (“[C]ases have been fairly unanimous in denying patentability to such methods”); Tew, Method of Doing Business, 16 J. Pat. Off. Soc. 607 (1934) (“It is probably settled by long practice and many precedents that ‘methods of doing business,’ as these words are generally understood, are unpatentable”). Indeed, “[u]ntil recently” it was still “considered well established that [business] methods were non-statutory.” 1 R. Moy, Walker on Patents § 5:28, p. 5-104 (4th ed. 2009).[35]

*639
Modern American Patent Law

By the mid-1900’s, many courts were construing the term “art” by using words such as “method, process, system, or like terms.” Berman 713; see Expanded Metal Co. v. Bradford, 214 U. S. 366, 382 (1909) (“The word ‘process’ has been brought into the decisions because it is supposedly an equivalent form of expression or included in the statutory designation of a new and useful art”).[36] Thus in 1952, when Congress updated the patent laws as part of its ongoing project to revise the United States Code, it changed the operative language in § 101, replacing the term “art” with “process” and adding a definition of “process” as a “process, art or method,” § 100(b).
That change was made for clarity and did not alter the scope of a patentable “process.” See Diehr, 450 U. S., at 184. The new terminology was added only in recognition of the fact that courts had been interpreting the category “art” by using the terms “process or method”; Congress thus wanted to avoid “the necessity of explanation that the word ‘art’ as used in this place means ‘process or method.’” S. Rep. No. 1979, 82d Cong., 2d Sess., 5 (1952) (hereinafter S. Rep. 1979); accord, H. R. Rep. No. 1923, 82d Cong., 2d Sess., 6 (1952) (hereinafter H. R. Rep. 1923); see also id., at 17 (explaining that “[t]he word ‘art’ ” in § 101 “has been interpreted by the courts as being practically synonymous with process or method,” and that the switch to the word “ ‘[process’ ” was intended only for clarity).[37]
It appears that when Congress changed the language in § 101 to incorporate the prevailing judicial terminology, it merely codified the prevailing judicial interpretation of that *640 category of subject matter. See Diehr, 450 U. S., at 184; see also Barber v. Gonzales, 347 U. S. 637, 641 (1954) (“While it is true that statutory language should be interpreted whenever possible according to common usage, some terms acquire a special technical meaning by a process of judicial construction”). Both the Senate and House Committee Reports explained that the word “process” was used in § 101 “to clarify the present law as to the patentability of certain types of processes or methods as to which some insubstantial doubts have been expressed.” S. Rep. 1979, at 5; accord, H. R. Rep. 1923, at 6. And both noted that those terms were used to convey the prevailing meaning of the term “art,” “as interpreted” by courts, S. Rep. 1979, at 17; accord, H. R. Rep. 1923, at 17. Indeed, one of the main drafters of the Act explained that the definition of the term “process” in § 100(b) reflects “how the courts have construed the term 'art.’” Tr. of Address by Judge Giles S. Rich to the New York Patent Law Association 7-8 (Nov. 6, 1952).
As discussed above, by this time, courts had consistently construed the term “art” to exclude methods of doing business. The 1952 Act likely captured that same meaning.[38] Cf. Graham, 383 U. S., at 16-17 (reasoning that because a provision of the 1952 Act “paraphrases language which has often been used in decisions of the courts” and was “added to the statute for uniformity and definiteness,” that provision should be treated as “a codification of judicial precedents” (internal quotation marks omitted)).[39] Indeed, Judge Rich, *641 the main drafter of the 1952 Act, later explained that “the invention of a more effective organization of the materials in, and the techniques of teaching a course in physics, chemistry, or Russian is not a patentable invention because it is outside of the enumerated categories of ‘process, machine, manufacture, or composition of matter, or any new and useful improvement thereof.’ ” Principles of Patentability, 28 Geo. Wash. L. Rev. 393, 394 (1960). “Also outside that group,” he added, was a process for doing business: “the greatest inventio[n] of our times, the diaper service.” Ibid.[40]

“Anything Under the Sun”

Despite strong evidence that Congress has consistently authorized patents for a limited class of subject matter and that the 1952 Act' did not alter the nature of the then-existing limits, petitioners and their amici emphasize a single phrase in the 1952 Act’s legislative history, which suggests that the *642 statutory subject matter “ ‘include[s] anything under the sun that is made by man.’” Brief for Petitioners 19 (quoting Chakrabarty, 447 U. S., at 309, in turn quoting S. Rep. 1979, at 5). Similarly, the Court relies on language from our opinion in Chakrabarty that was based in part on this piece of legislative history. See ante, at 601, 602-603.
This reliance is misplaced. We have never understood that piece of legislative history to mean that any series of steps is a patentable process. Indeed, if that were so, then our many opinions analyzing what is a patentable process were simply wastes of pages in the U. S. Reports. And to accept that errant piece of legislative history as widening the scope of the patent law would contradict other evidence in the congressional record, as well as our presumption that the 1952 Act merely codified the meaning of “process” and did not expand it, see Diehr, 450 U. S., at 184.
Taken in context, it is apparent that the quoted language has a far less expansive meaning. The full sentence in the Committee Reports reads: “A person may have ‘invented’ a machine or a manufacture, which may include anything under the sun that is made by man, but it is not necessarily patentable under section 101 unless the conditions of [this] title are fulfilled.” S. Rep. 1979, at 5; H. R. Rep. 1923, at 6. Viewed as a whole, it seems clear that this language does not purport to explain that “anything under the sun” is patentable. Indeed, the language may be understood to state the exact opposite: that “[a] person may have ‘invented’... anything under the sun,” but that thing “is not necessarily patentable under section 101.” Thus, even in the Chakrabarty opinion, which relied on this quote, we cautioned that the 1952 Reports did not “suggest that § 101 has no limits or that it embraces every discovery.” 447 U. S., at 309.
Moreover, even if the language in the Committee Reports was meant to flesh out the meaning of any portion of § 101, it did not purport to define the term “process.” The language refers only to “manufacture^]” and “machine[s],” tangible *643 objects “made by man.” It does not reference the “process” category of subject matter (nor could a process be comfortably described as something “made by man”). The language may also be understood merely as defining the term “invents” in §101. As Judge Dyk explained in his opinion below, the phrase “made by man” “is reminiscent” of a 1790’s description of the limits of English patent law, that an “invention must be ‘made by man’ ” and cannot be “ ‘a philosophical principle only, neither organized or capable of being organized’ from a patentable manufacture.” 545 F. 3d, at 976 (quoting Hornblower v. Boulton, 8 T. R. 95, 98, 101 Eng. Rep. 1285, 1288 (K. B. 1799)).
The 1952 Act, in short, cannot be understood as expanding the scope of patentable subject matter by suggesting that any series of steps may be patented as a “process” under § 101. If anything, the 1952 Act appears to have codified the conclusion that subject matter which was understood not to be patentable in 1952 was to remain unpatentable.
Our recent case law reinforces my view that a series of steps for conducting business is not a “process” under § 101. Since Congress passed the 1952 Act, we have never ruled on whether that Act authorizes patents on business methods. But we have cast significant doubt on that proposition by giving substantial weight to the machine-or-transformation test, as general methods of doing business do not pass that test. And more recently, Members of this Court have noted that patents on business methods are of “suspect validity.” eBay Inc. v. MercExchange, L. L. C., 547 U. S. 388, 397 (2006) (Kennedy, J., concurring).
* * *
Since at least the days of Assyrian merchants, people have devised better and better ways to conduct business. Yet it appears that neither the Patent Clause, nor early patent law, nor the current § 101 contemplated or was publicly understood to mean that such innovations are patentable. Al *644 though it may be difficult to define with precision what is a patentable “process” under § 101, the historical clues converge on one conclusion: A business method is not a “process.” And to the extent that there is ambiguity, we should be mindful of our judicial role. “[W]e must proceed cautiously when we are asked to extend patent rights” into an area that the Patent Act likely was not “enacted to protect,” Flook, 437 U. S., at 596, 593, lest we create a legal regime that Congress never would have endorsed, and that can be repaired only by disturbing settled property rights.
V
Despite the strong historical evidence that a method of doing business does not constitute a “process” under § 101, petitioners nonetheless argue — and the Court suggests in dicta, ante, at 607-608 — that a subsequent law, the First Inventor Defense Act of 1999, “must be read together” with § 101 to make business methods patentable. Brief for Petitioners 29. This argument utilizes a flawed method of statutory interpretation and ignores the motivation for the 1999 Act.
In 1999, following a Federal Circuit decision that intimated business methods could be patented, see State Street, 149 F. 3d 1368, Congress moved quickly to limit the potential fallout. Congress passed the 1999 Act, codified at 35 U. S. C. §273, which provides a limited defense to claims of patent infringement, see § 273(b), regarding certain “method[s] of doing or conducting business,” § 273(a)(3).
It is apparent, both from the content and history of the 1999 Act, that Congress did not in any way ratify State Street (or, as petitioners contend, the broadest possible reading of State Street). The 1999 Act merely limited one potential effect of that decision: that businesses might suddenly find themselves liable for innocently using methods they assumed could not be patented. The 1999 Act did not purport to amend the limitations in §101 on eligible subject matter. *645 Indeed, Congress placed the statute in Part III of Title 35, which addresses “Patents and Protection of Patent Rights,” rather than in Part II, which contains §101 and addresses “Patentability of Inventions and Grant of Patents.” Particularly because petitioners’ reading of the 1999 Act would expand §101 to cover a category of processes that have not “historically been eligible” for patents, Diehr, 450 U. S., at 184, we should be loath to conclude that Congress effectively amended § 101 without saying so clearly. We generally presume that Congress “does not, one might say, hide elephants in mouseholes.” Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 468 (2001).
The 1999 Act therefore is, at best, merely evidence of 1999 legislative views on the meaning of the earlier, 1952 Act. “[T]he views of a subsequent Congress,” however, “form a hazardous basis for inferring the intent of an earlier one.” United States v. Price, 361 U. S. 304, 313 (1960). When a later statute is offered as “an expression of how the . . . Congress interpreted a statute passed by another Congress ... a half century before,” “such interpretation has very little, if any, significance.” Rainwater v. United States, 356 U. S. 590, 593 (1958).
Furthermore, even assuming that Congress’ views at the turn of the 21st century could potentially serve as a valid basis for interpreting a statute passed in the mid-20th century, the First Inventor Defense Act does not aid petitioners because it does not show that the later Congress itself understood § 101 to cover business methods. If anything, it shows that a few judges on the Federal Circuit understood § 101 in that manner and that Congress understood what those judges had done. The 1999 Act appears to reflect surprise and perhaps even dismay that business methods might be patented. Thus, in the months following State Street, congressional authorities lamented that “business methods and processes . . . until recently were thought not to be patent *646 able,” H. R. Rep. No. 106-464, p. 121 (1999); accord, H. R. Rep. No. 106-287, pt. 1, p. 31 (1999).[41] The fact that Congress decided it was appropriate to create a new defense to claims that business method patents were being infringed merely demonstrates recognition that such claims could create a significant new problem for the business community.
The Court nonetheless states that the 1999 Act “acknowledges that there may be business method patents,” thereby “clarifying]” its “understanding” of §101. Ante, at 607. More specifically, the Court worries that if we were to interpret the 1952 Act to exclude business methods, our interpretation “would render §273 meaningless.” Ibid. I agree that “[a] statute should be construed so that effect is given to all its provisions.” Corley v. United States, 556 U. S. 303, 314 (2009) (internal quotation marks omitted). But it is a different matter altogether when the Court construes one statute, the 1952 Act, to give effect to a different statute, the 1999 Act. The canon on which the Court relies is predicated upon the idea that “[a] statute is passed as a whole.” 2A N. Singer & J. Singer, Statutes and Statutory Construction § 46:5, p. 189 (7th ed. 2007). But the two statutes in question were not passed as a whole.
Put another way, we ordinarily assume, quite sensibly, that Congress would not in one statute include two provisions that are at odds with each other. But as this case shows, that sensible reasoning can break down when applied to dif *647 ferent statutes.[42] The 1999 Act was passed to limit the impact of the Federal Circuit’s then-recent statements on the 1952 Act. Although repudiating that judicial dictum (as we should) might effectively render the 1999 Act a nullity going forward, such a holding would not mean that it was a nullity when Congress enacted it. Section 273 may have been a technically unnecessary response to confusion about patentable subject matter, but it appeared necessary in 1999 in light of what was being discussed in legal circles at the time.[43] Consider the logical implications of the Court’s approach to this question: If, tomorrow, Congress were to conclude that patents on business methods are so important that the special infringement defense in §273 ought to be abolished, and thus repealed that provision, this could paradoxically strengthen the case against such patents because there would no longer be a §273 that “acknowledges . . . business method patents,” ante, at 607. That is not a sound method of statutory interpretation.
In light of its history and purpose, I think it obvious that the 1999 Congress would never have enacted § 273 if it had foreseen that this Court would rely on the provision as a *648 basis for concluding that business methods are patentable. Section 273 is a red herring; we should be focusing our attention on § 101 itself.
VI
The constitutionally mandated purpose and function of the patent laws bolster the conclusion that methods of doing business are not “processes” under § 101.
The Constitution allows Congress to issue patents “[t]o promote the Progress of . . . useful Arts,” Art. I, § 8, cl. 8. This clause “is both a grant of power and a limitation.” Graham, 383 U. S., at 5. It “reflects a balance between the need to encourage innovation and the avoidance of monopolies which stifle competition without any concomitant advance in the 'Progress of Science and useful Arts.’ ” Bonito Boats, 489 U. S., at 146. “This is the standard expressed in the Constitution and it may not be ignored. And it is in this light that patent validity 'requires reference to [the] standard written into the Constitution'” Graham, 383 U. S., at 6 (quoting Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U. S. 147, 154 (1950) (Douglas, J., concurring) (emphasis deleted)); see also Grant v. Raymond, 6 Pet. 218, 241-242 (1832) (explaining that patent “laws which are passed to give effect to this [constitutional] purpose ought, we think, to be construed in the spirit in which they have been made”).[44]
Thus, although it is for Congress to “implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim,” Graham, *649 383 U. S., at 6, we interpret ambiguous patent laws as a set of rules that “wee[d] out those inventions which would not be disclosed or devised but for the inducement of a patent,” id., at 11, and that “embod[y]” the “careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy,” Bonito Boats, 489 U. S., at 146. And absent a discernible signal from Congress, we proceed cautiously when dealing with patents that press on the limits of the “'standard written into the Constitution,’” Graham, 383 U. S., at 6, for at the “fringes of congressional power,” “more is required of legislatures than a vague delegation to be filled in later,” Barenblatt v. United States, 360 U. S. 109, 139-140 (1959) (Black, J., dissenting); see also Greene v. McElroy, 360 U. S. 474, 507 (1959) (“[Decisions of great constitutional import and effect” “requir[e] careful and purposeful consideration by those responsible for enacting and implementing our laws”). We should not casually risk exceeding the constitutional limitation on Congress’ behalf.
The Court has kept this “constitutional standard” in mind when deciding what is patentable subject matter under § 101. For example, we have held that no one can patent “laws of nature, natural phenomena, and abstract ideas.” Diehr, 450 U. S., at 185. These “are the basic tools of scientific and technological work,” Benson, 409 U. S., at 67, and therefore, if patented, would stifle the very progress that Congress is authorized to promote, see, e. g., O’Reilly v. Morse, 15 How. 62, 113 (1854) (explaining that Morse’s patent on electromagnetism for writing would pre-empt a wide swath of technological developments).
Without any legislative guidance to the contrary, there is a real concern that patents on business methods would press on the limits of the “standard expressed in the Constitution,” Graham, 383 U. S., at 6 (emphasis deleted), more likely stifling progress than “promoting]” it. U. S. Const., Art. I, § 8, *650 cl. 8. I recognize that not all methods of doing business are the same, and that therefore the constitutional “balance,” Bonito Boats, 489 U. S., at 146, may vary within this category. Nevertheless, I think that this balance generally supports the historic understanding of the term “process” as excluding business methods. And a categorical analysis fits with the purpose, as Thomas Jefferson explained, of ensuring that “ ‘every one might know when his actions were safe and lawful,’ ” Graham, 383 U. S., at 10; see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U. S. 722, 730-731 (2002) (“The monopoly is a property right; and like any property right, its boundaries should be clear. This clarity is essential to promote progress”); Diehr, 450 U. S., at 219 (Stevens, J., dissenting) (it is necessary to have “rules that enable a conscientious patent lawyer to determine with a fair degree of accuracy” what is patentable).
On one side of the balance is whether a patent monopoly is necessary to “motivate the innovation,” Pfaff v. Wells Electronics, Inc., 525 U. S. 55, 63 (1998). Although there is certainly disagreement about the need for patents, scholars generally agree that when innovation is expensive, risky, and easily copied, inventors are less likely to undertake the guaranteed costs of innovation in order to obtain the mere possibility of an invention that others can copy.[45] Both common sense and recent economic scholarship suggest that these dynamics of cost, risk, and reward vary by the type of thing being patented.[46] And the functional case that patents promote progress generally is stronger for subject matter that has “historically been eligible to receive the protection of our patent laws,” Diehr, 450 U. S., at 184, than for methods of doing business.
*651 Many have expressed serious doubts about whether patents are necessary to encourage business innovation.[47] Despite the fact that we have long assumed business methods could not be patented, it has been remarked that “the chief business of the American people is business.” [48] Federal Express developed an overnight delivery service and a variety of specific methods (including shipping through a central hub and online package tracking) without a patent. Although counterfactuals are a dubious form of analysis, I find it hard to believe that many of our entrepreneurs forwent business innovation because they could not claim a patent on their new methods.
“[C]ompanies have ample incentives to develop business methods even without patent protection, because the competitive marketplace rewards companies that use more efficient business methods.” Burk & Lemley 1618.[49] Innovators often capture advantages from new business methods notwithstanding the risk of others copying their innovation. Some business methods occur in secret and therefore can be protected with trade secrecy.[50] And for those methods that occur in public, firms that innovate often capture long-term benefits from doing so, thanks to various first-mover advantages, including lock-ins, branding, and networking effects.[51] *652 Business innovation, moreover, generally does not entail the same kinds of risk as does more traditional, technological innovation. It generally does not require the same “enormous costs in terms of time, research, and development,” Bicron, 416 U. S., at 480, and thus does not require the same kind of “compensation to [innovators] for their labor, toil, and expense,” Seymour v. Osborne, 11 Wall. 516, 533-544 (1871).[52]
Nor, in many cases, would patents on business methods promote progress by encouraging “public disclosure.” Pf&ff, 525 U. S., at 63; see also Brenner v. Manson, 383 U. S. 519, 533 (1966) (“[0]ne of the purposes of the patent system is to encourage dissemination of information concerning discoveries and inventions”). Many business methods are practiced in public, and therefore a patent does not necessarily encourage the dissemination of anything not already known. And for the methods practiced in private, the benefits of disclosure may be small: Many such methods are distributive, not productive — that is, they do not generate any efficiency but only provide a means for competitors to one-up each other in a battle for pieces of the pie. And as the Court has explained, “it is hard to see how the public would be benefited by disclosure” of certain business tools, since the nondisclosure of these tools “encourages businesses to initiate new and individualized plans of operation,” which, “in turn, leads to a greater variety of business methods.” Bicron, 416 U. S., at 483.
In any event, even if patents on business methods were useful for encouraging innovation and disclosure, it would *653 still be questionable whether they would, on balance, facilitate or impede the progress of American business. For even when patents encourage innovation and disclosure, “too much patent protection can impede rather than ‘promote the Progress of . . . useful Arts.’” Laboratory Corp. of America Holdings v. Metabolite Laboratories, Inc., 548 U. S. 124, 126-127 (2006) (Breyer, J., dissenting from dismissal of certiorari). Patents “can discourage research by impeding the free exchange of information,” for example, by forcing people to “avoid the use of potentially patented ideas, by leading them to conduct costly and time-consuming searches of existing or pending patents, by requiring complex licensing arrangements, and by raising the costs of using the patented” methods. Id., at 127. Although “[e]very patent is the grant of a privilege of exacting tolls from the public,” Great Atlantic, 340 U. S., at 154 (Douglas, J., concurring), the tolls of patents on business methods may be especially high.
The primary concern is that patents on business methods may prohibit a wide swath of legitimate competition and innovation. As one scholar explains, “it is useful to conceptualize knowledge as a pyramid: the big ideas are on top; specific applications are at the bottom.” Dreyfuss 275. The higher up a patent is on the pyramid, the greater the social cost and the greater the hindrance to further innovation.[53] Thus, this Court stated in Benson that “[phenomena of nature ..., mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work,” 409 U. S., at 67; see also Joseph E. Seagram & Sons, Inc., 180 F. 2d, at 28 (“To give appellant a monopoly, through the issuance of a patent, upon so great an area .. . would in our view impose without warrant of law a serious restraint upon the advance of science and industry”). *654 Business methods are similarly often closer to “big ideas,” as they are the basic tools of commercial work. They are also, in many cases, the basic tools of further business innovation: Innovation in business methods is often a sequential and complementary process in which imitation may be a “spur to innovation” and patents may “become an impediment.” Bessen & Maskin, Sequential Innovation, Patents, and Imitation, 40 RAND J. Econ. 611, 613 (2009).[54] “Think how the airline industry might now be structured if the first company to offer frequent flyer miles had enjoyed the sole right to award them.” Dreyfuss 264. “[limitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy.” Bonito Boats, 489 U. S., at 146.
If business methods could be patented, then many business decisions, no matter how small, could be potential patent violations. Businesses would either live in constant fear of litigation or would need to undertake the costs of searching through patents that describe methods of doing business, attempting to decide whether their innovation is one that remains in the public domain. See Long, Information Costs in Patent and Copyright, 90 Va. L. Rev. 465, 487-488 (2004) (hereinafter Long). But as we have long explained, patents should not “embarras[s] the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith.” Atlantic Works v. Brady, 107 U. S. 192, 200 (1883).[55]
*655 These effects are magnified by the “potential vagueness” of business method patents, eBay Inc., 547 U. S., at 397 (Kennedy, J., concurring). When it comes to patents, “clarity is essential to promote progress.” Festo Corp., 535 U. S., at 730-731. Yet patents on methods of conducting business generally are composed largely or entirely of intangible steps. Compared to “the kinds of goods . . . around which patent rules historically developed,” it thus tends to be more costly and time consuming to search through, and to negotiate licenses for, patents on business methods. See Long 539, 470.[56]
The breadth of business methods, their omnipresence in our society, and their potential vagueness also invite a particularly pernicious use of patents that we have long criticized. As early as the 19th century, we explained that the patent laws are not intended to “creat[e] a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts.” Atlantic Works, 107 U. S., at 200. Yet business method patents may have begun to do exactly that. See eBay Inc., 547 U. S., at 396-397 (opinion of Kennedy, J.).
These many costs of business method patents not only may stifle innovation, but they are also likely to “stifle competi *656 tion,” Bonito Boats, 489 U. S., at 146. Even if a business method patent is ultimately held invalid, patent holders may be able to use it to threaten litigation and to bully competitors, especially those that cannot bear the costs of a drawn-out, fact-intensive patent litigation.[57] That can take a particular toll on small and upstart businesses.[58] Of course, patents always serve as a barrier to competition for the type of subject matter that is patented. But patents on business methods are patents on business itself. Therefore, unlike virtually every other category of patents, they are by their very nature likely to depress the dynamism of the marketplace.[59]
* * *
The constitutional standard for patentability is difficult to apply with any precision, and Congress has significant discretion to “implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim,” Graham, 383 U. S., at 6. But Congress has not, either explicitly or implicitly, determined that patents on methods of doing business would effectuate this aim. And as I understand their practical consequences, it is hard to see how they would.
*657 YII
The Constitution grants to Congress an important power to promote innovation. In its exercise of that power, Congress has established an intricate system of intellectual property. The scope of patentable subject matter under that system is broad. But it is not endless. In the absence of any clear guidance from Congress, we have only limited textual, historical, and functional clues on which to rely. Those clues all point toward the same conclusion: that petitioners’ claim is not a “process” within the meaning of § 101 because methods-of doing business are not, in themselves, covered by the statute. In my view, acknowledging as much would be a far more sensible and restrained way to resolve this case. Accordingly, while I concur in the judgment, I strongly disagree with the Court’s disposition of this case.

 Even if the machine-or-transformation test may not define the scope of a patentable process, it would be a grave mistake to assume that anything with a “ ‘useful, concrete and tangible result,’ ” State Street Bank & Trust Co. v. Signature Financial Group, Inc., 149 F. 3d 1368, 1373 (CA Fed. 1998), may be patented.

 For example, a rule that broadly phrased claims cannot constitute patentable processes could call into question our approval of Alexander Graham Bell’s famous fifth claim on “‘[t]he method of, and apparatus for, transmitting vocal or other sounds telegraphically, as herein described, by causing electrical undulations, similar in form to the vibrations of the air accompanying the said vocal or other sounds, substantially as set forth,’ ” The Telephone Cases, 126 U. S. 1, 531 (1888).

 The Court quotes our decision in Diamond v. Chakrabarty, 447 U. S. 303 (1980), for the proposition that, “ ‘[i]n choosing such expansive terms . . . modified by the comprehensive “any,” Congress plainly contemplated that the patent laws would be given wide scope.’ ” Ante, at 601. But the Court fails to mention which terms we were discussing in Chakrabarty: the terms “manufacture” and “composition of matter.” See 447 U. S., at 308 (“In choosing such expansive terms as ‘manufacture’ and ‘composition of matter,’ modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope”). As discussed herein, Congress’ choice of the term “process” reflected a background understanding of what sorts of series of steps could be patented, and likely reflected an intentional design to codify that settled, judicial understanding. This may not have been the case with the terms at issue in Chakrabarty.

 For example, if this Court were to interpret the Sherman Act according to the Act’s plain text, it could prohibit “the entire body of private contract,” National Soc. of Professional Engineers v. United States, 435 U. S. 679, 688 (1978).

 The Court attempts to avoid such absurd results by stating that these “[e]oneerns” “can be met by making sure the claim meets the requirements of § 101.” Ante, at 603. Because the only limitation on the plain meaning of “process” that the Court acknowledges explicitly is the bar on abstract ideas, laws of nature, and the like, it is presumably this limitation that is *625 left to stand between all conceivable human activity and patent monopolies. But many processes that would make for absurd patents are not abstract ideas. Nor can the requirements of novelty, nonobviousness, and particular description pick up the slack. Cf. ante, at 609 (plurality opinion). A great deal of human activity was at some time novel and nonobvious.

 Curiously, the Court concedes that “these exceptions are not required by the statutory text,” but urges that “they are consistent with the notion that a patentable process must be ‘new and useful.’ ” Ante, at 601-602 (emphasis added). I do not see how these exceptions find a textual home in the term “new and useful.” The exceptions may be consistent with those words, but they are sometimes inconsistent with the “ordinary, contemporary, common meaning,” ante, at 603, 607 (internal quotation marks omitted), of the words “process” and “method.”

 See Pennock v. Dialogue, 2 Pet. 1, 18 (1829) (“[M]any of the provisions of our patent act are derived from the principles and practice which have prevailed in the construction of that of England”); Proceedings in Congress During the Years 1789 and 1790 Relating to the First Patent and Copyright Laws, 22 J. Pat. Off. Soc. 352, 363 (1940) (explaining that the 1790 Patent Act was “framed according to the Course of Practice in the English Patent Office”); see also Walterscheid, The Early Evolution of the United States Patent Law: Antecedents, 76 J. Pat. & Trademark Off. Soc. 697, 698 (1994) (describing the role of the English backdrop).

 See Hornblower v. Boulton, 8 T. R. 95 (K. B. 1799).

 See, e. g., Roebuck and Garbett v. William Stirling & Son (H. L. 1774), reprinted in 1 T. Webster, Reports and Notes of Cases on Letters Patent for Inventions 45 (1844) (“method of making acid spirit by burning sulphur and saltpetre, and collecting the condensed fumes”); id., at 77 (“ ‘method of producing a yellow colour for painting in oil or water, making white lead, and separating the mineral alkali from common salt, all to be performed in one single process’ ”); see also C. MacLeod, Inventing the Industrial Revolution: The English Patent System, 1660-1800, pp. 84-93, 100—104, 109-110, 152-155 (1988) (hereinafter MacLeod) (listing patents).

 Some English cases made reference to the permissibility of patents over new “trades.” But so far as I can tell, the term “trade” referred not to the methods of conducting business but rather to methods of making and using physical items or to the object of the trade. See, e. g., Cloth-workers of Ipswich Case, Godb. 252, 254, 78 Eng. Rep. 147, 148 (K. B. 1615) (“[I]f a man hath brought in a new invention and a new trade within the kingdom ... [the King] may grant by charter unto him”).

 See also Pollack, The Multiple Uneonstitutionality of Business Method Patents: Common Sense, Congressional Consideration, and Constitutional History, 28 Rutgers Computer & Tech. L. J. 61, 94-96 (2002) (hereinafter Pollack) (describing English practice).

 See id., at 95; B. Woodcroft, Alphabetical Index of Patentees of Inventions, from March 2, 1617 (14 James I) to October 1, 1852 (16 Victoriae) 383, 410 (2d ed. 1969) (hereinafter Woodcroft).

 See, e. g., C. Ewen, Lotteries and Sweepstakes 70-71 (1932) (describing the “letters patent” to form a colony in Virginia and to operate lotteries to fund that colony).

 See also Renn, John Knox’s Plan for Insuring Lives: A Patent of Invention in 1778, 101 J. Inst. Actuaries 285, 286 (1974) (hereinafter Renn) (describing the patent).

 “The English patent system” at that time “was one of simple registration. Extensive scrutiny was not expected of the law officers administering it.” MacLeod 41. Thus, as one scholar suggested of the patent on life insurance, “perhaps the Law Officer was in a very good humour that day, or perhaps he had forgotten the wording of the statute; most likely he was concerned only with the promised ‘very considerable Consumption of [Revenue] Stamps’ which [the patent holder] declared, would ‘contribute to the increase of the Public Revenues.’ ” Renn 285.

 See Markman v. Westview Instruments, Inc., 517 U. S. 370, 381 (1996) (“[T]he state of patent law in the common-law courts before 1800 led one historian to observe that ‘the reported cases are destitute of any decision of importance’ ” (quoting Hulme, On the Consideration of the Patent Grant, Past and Present, 13 L. Q. Rev. 313, 318 (1897))); MacLeod 1, 61-62 (explaining the dearth of clear case law); see also Boulton v. Bull, 2 H. Bl. 463, 491, 126 Eng. Rep. 651, 665 (C. P. 1795) (Eyre, C. J.) (“Patent rights are no where that I can find accurately discussed in our books”).

 See, e. g., A. DuBois, The English Business Company After the Bubble Act, 1720-1800, pp. 38-40, 435-438 (1938); Harris, The Bubble Act: Its Passage and Its Effects on Business Organization, 54 J. Econ. Hist. 610, 624-625 (1994).

 See Pollack 97-100. For example, those who held patents on oil lamps developed firms that contracted to provide street lighting. See M. Falkus, Lighting in the Dark Ages of English Economic History: Town Streets Before the Industrial Revolutions, in Trade, Government and Economy in Pre-Industrial England 249, 255-257, 259-260 (D. Coleman & A. John eds. 1976).

 See, e. g., G. Hammersley, The State and the English Iron Industry in the Sixteenth and Seventeenth Centuries, in id., at 166, 173, 175-178 (describing the advent of management techniques for efficiently running a major ironworks).

 See, e. g., Carlos & Nicholas, Agency Problems in Early Chartered Companies: The Case of the Hudson’s Bay Company, 50 J. Econ. Hist. 853, 853-875 (1990).

 Nor, so far as I can tell, were business method patents common in the United States in the brief period between independence and the creation of our Constitution — despite the fact that it was a time of great business innovation, including new processes for engaging in risky trade and transport, one of which has been called “the quintessential business innovation of the 1780s.” T. Doerflinger, A Vigorous Spirit of Enterprise: Merchants and Economic Development in Revolutionary Philadelphia 291 (1986) (describing new methods of conducting and financing trade with China).

 See Seidel, The Constitution and a Standard of Patentability, 48 J. Pat. Off. Soc. 5, 10 (1966) (hereinafter Seidel); Walterscheid, To Promote the Progress of Science and Useful Arts: The Background and Origin of the Intellectual Property Clause of the United States Constitution, 2 J. Intell. Prop. L. 1, 26 (1994) (hereinafter Walterscheid, Background and Origin); Walterscheid, To Promote the Progress 59, and n. 12; Prager, A History of Intellectual Property From 1545 to 1787, 26 J. Pat. Off. Soc. 711, 746 (1944).

 Walterscheid, Background and Origin 26; 2 Records of the Federal Convention of 1787, pp. 509-510 (M. Farrand ed. 1966).

 J. Madison, Notes of Debates in the Federal Convention of 1787, pp. 638-639 (Ohio Univ. Press ed. 1966).

 See Walterscheid, Background and Origin 38, n. 124, 55-56 (collecting sources); see also The Objections of Hon. George Mason, One of the Delegates From Virginia, in the Late Continental Convention, to the Proposed Federal Constitution, Assigned as His Reasons for Not Signing the Same, 2 American Museum or Repository of Ancient and Modern Fugitive Pieces, etc. 534, 536 (1787); Ratification of the New Constitution by the Convention of the State of New York, 4 id., at 153, 156 (1789); Remarks on the Amendments to the Federal Constitution Proposed by The Conventions of Massachusetts, New Hampshire, New York, Virginia, South and North Carolina, With the Minorities of Pennsylvania and Maryland by the Rev. Nicholas Collin, D. D., 6 id., at 303.

 Some scholars suggest that Webster’s “close proximity to the Constitutional Convention coupled with his familiarity with the delegates makes it likely that he played some indirect role in the development” of the Constitution’s Intellectual Property Clause- — a Clause that established not only the power to create patents but also copyrights, a subject in which Webster had great interest. Donner, Copyright Clause of the U. S. Constitution: Why Did the Framers Include It With Unanimous Approval? 36 Am. J. Legal Hist. 361, 372 (1992). But there is no direct evidence of this fact. See Walterscheid, Background and Origin 40-41.

 See, e. g., 1 S. Johnson, Dictionary of the English Language (1773) (listing as definitions of an “art”: “[t]he power of doing something not taught by nature and instinct,” “[a] science; as, the liberal arts,” “[a] trade,” “[a]rtfulness; skill; dexterity,” “[ejunning,” and “[s]peeulation”). One might question the breadth of these definitions. This same dictionary offered as an example of “doing something not taught by nature and instinct,” the art of “dance”; and as an example of a “trade,” the art of “making sugar.” Ibid.

 For examples of this usage, see Book of Trades or Library of Useful Arts (1807) (describing in a three-volume work 68 trades, each of which is the means of creating a product, such as feather worker or cork cutter); 1 J. Bigelow, The Useful Arts Considered in Connexion With the Applications of Science (1840) (surveying a history of what we would today call mechanics, technology, and engineering). See also D. Defoe, A General History of Discoveries and Improvements, in Useful Arts (1727); T. Coxe, An Address to an Assembly of the Friends of American Manufactures 17-18 (1787); G. Logan, A Letter to the Citizens of Pennsylvania, on the Necessity of Promoting Agriculture, Manufactures, and the Useful Arts 12-13 (2d ed. 1800); W. Kenrick, An Address to the Artists and Manufacturers of Great Britain 21-38 (1774); cf. Corning v. Burden, 15 How. 252, 267 (1854) (listing the “arts of tanning, dyeing, making water-proof cloth, vulcanizing India rubber, [and] smelting ores”).

 See, e. g., 1 D. Chisum, Patents Gl-23 (2010); Lutz, Patents and Science: A Clarification of the Patent Clause of the U. S. Constitution, 18 Geo. Wash. L. Rev. 50, 54 (1949-1950); Samuelson, Benson Revisited: The Case Against Patent Protection for Algorithms and Other Computer Program-Related Inventions, 39 Emory L. J. 1025, 1033, n. 24 (1990); Seidel 10,13; see also Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U. S. 147, 154 (1950) (Douglas, J., concurring) (explaining that in the Framers’ view, an “invention, to justify a patent, had to serve the ends of science — to push back the frontiers of chemistry, physics, and the like; to make a distinctive contribution to scientific knowledge”); In re Waldbaum, 457 F. 2d 997, 1003 (CCPA 1972) (Rich, J., concurring) (“ ‘The phrase “technological arts,” as we have used it, is synonymous with the phrase “useful arts” as it appears in Article I, Section 8 of the Constitution’ ”); Paulik v. Rizkalla, 760 F. 2d 1270, 1276 (CA Fed. 1985) (explaining that “useful arts” is “the process today called technological innovation”); Thomas, The Post-Industrial Patent System, 10 Ford. Intell. Prop. Media & Ent. L. J. 3, 32-55 (1999) (cataloguing early understandings of technological arts). This view may be supported, for example, by an 1814 grant to Harvard University to create a “Professorship on the Application of Science to the Useful Arts,” something that today might be akin to applied science or engineering. See M. James, Engineering an Environment for Change: Bigelow, Peirce, and Early Nineteenth-Century Practical Education at Harvard, in Science at Harvard University: Historical Perspectives 59 (C. Elliott & M. Rossiter eds. 1992).

 See Walterscheid, To Promote the Progress 173-178; Pollack 107-108.

 These doubts ended by the time of Cochrane v. Deener, 94 U. S. 780 (1877), in which we held that “a process may be patentable, irrespective of the particular form of the instrumentalities used,” and therefore one may patent “an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing.” Id., at 787-788.

 A skeptic of patents, Jefferson described this as “drawing a line between the things which are worth to the public the embarrassment of an exclusive patent, and those which are not.” 13 Writings of Thomas Jefferson 335 (Memorial ed. 1904).

 See, e. g., Expanded Metal Co. v. Bradford, 214 U. S. 366, 383, 385-386 (1909); The Telephone Cases, 126 U. S., at 533-537; Cochrane, 94 U. S., at 787-788; Burden, 15 How., at 267-268.

 See also 1 A. Deller, Walker on Patents §26, p. 152 (2d ed. 1964) (A “ ‘system’ or method of transacting business is not [a process], nor does it come within any other designation of patentable subject matter”).

 Although a few patents issued before 1952 related to methods of doing business, see United States Patent and Trademark Office, Automated Financial or Management Data Processing Methods, online at http://www. uspto.gov/web/menu/busmethp/index.html (as visited June 26, 2010, and available in Clerk of Court’s case file), these patents were rare, often issued through self-registration rather than any formalized patent examination, generally were not upheld by courts, and arguably are distinguishable from pure patents on business methods insofar as they often involved the manufacture of new objects. See In re Bilski, 545 F. 3d 943, 974, and n. 18 (CA Fed. 2008) (case below) (Dyk, J., concurring); Pollack 74-75; Walterscheid, To Promote the Progress 243.

 For examples of such usage, see The Telephone Cases, 126 U. S., at 533, and Burden, 15 How., at 267.

 See also 98 Cong. Rec. A415 (1952) (remarks of Rep. Bryson) (describing, after the fact, the 1952 Act, and explaining that “[t]he word ‘art’ was changed to ‘process’ in order to clarify its meaning. No change in substance was intended”).

 The 1952 Act also retained the language “invents or discovers,” which by that time had taken on a connotation that would tend to exclude business methods. See B. Evans & C. Evans, A Dictionary of Contemporary American Usage 137 (1957) (explaining that “discover; invent” means “to make or create something new, especially, in modern usage, something ingeniously devised to perform mechanical operations”).

 As explained in Part II, supra, the Court engages in a Jekyll-and-Hyde form of interpretation with respect to the word “process” in *641 § 101. It rejects the interpretation I proffer because the words “process” and “method” do not, on their face, distinguish between different series of acts. Ante, at 606-607. But it also rejects many sorts of processes without a textual basis for doing so. See ante, at 601-602, 604, 609-612. And while the Court rests a great deal of weight on Parker v. Flook, 437 U. S. 584 (1978), for its analysis of abstract ideas, the Court minimizes Flook’s rejection of “a purely literal reading of § 101,” as well as Flook’s reliance on the historical backdrop of § 101 and our understanding of what “the statute was enacted to protect,” id., at 588-590, 593; see also Diamond v. Diehr, 450 U. S. 175, 192 (1981) (explaining that a “claim satisfies the requirements of § 101” when it “is performing a function which the patent laws were designed to protect”).

 Forty years later, Judge Rich authored the State Street opinion that some have understood to make business methods patentable. But State Street dealt with whether a piece of software could be patented and addressed only claims directed at machines, not processes. His opinion may therefore be better understood merely as holding that an otherwise patentable process is not unpatentable simply because it is directed toward the conduct of doing business — an issue the Court has no occasion to address today. See 149 F. 3d, at 1375.

 See also 145 Cong. Ree. 30985 (1999) (remarks of Sen. Schumer) (explaining that “[i]n State Street, the Court did away with the so-called ‘business methods’ exception to statutory patentable subject matter,” and “[t]he first inventor defense will provide ... important, needed protections in the face of the uncertainty presented by ... the State Street case”); id., at 31007 (remarks of Sen. DeWine) (“Virtually no one in the industry believed that these methods or processes were patentable”); id., at 19281 (remarks of Rep. Manzullo) (“Before the State Street Bank and Trust case ... it was universally thought that methods of doing or conducting business were not patentable items”).

 The Court opines that “[t]his principle, of course, applies to interpreting any two provisions in the U. S. Code, even when Congress enacted the provisions at different times.” Ante, at 608 (emphasis added). The only support the Court offers for this proposition is a 1939 opinion for three Justices, in Hague v. Committee for Industrial Organization, 307 U. S. 496, 528-530 (opinion of Stone, J.). But that opinion is inapposite. Although Justice Stone stated that two provisions “must be read together,” id., at 530, he did so to explain that an ambiguity in a later-in-time statute must be understood in light of the earlier-in-time framework against which the ambiguous statute was passed, id., at 528-530, particularly because the later statute explicitly stated that it “ ‘shall not be construed to apply’ ” to the provision created by an earlier Act, id., at 528.

 I am not trying to “overcome” an “established rule of statutory interpretation” with “judicial speculation as to the subjective intent of various legislators,” ante, at 608, but, rather, I am explaining why the Court has illogieally expanded the canon upon which it relies beyond that canon’s logical underpinnings.

 See also Quanta Computer, Inc. v. LG Electronics, Inc., 553 U. S. 617, 626 (2008) (“ ‘[T]he primary purpose of our patent laws is not the creation of private fortunes for the owners of patents but is “to promote the progress of science and useful arts” ’ ” (quoting Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502, 511 (1917))); Pfaffv. Wells Electronics, Inc., 525 U. S. 55, 63 (1998) (“[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology”).

 See generally W. Landes & R. Posner, The Economic Structure of Intellectual Property Law 13-15 (2003).

 See, e. g., Burk & Lemley, Policy Levers in Patent Law, 89 Va. L. Rev. 1575, 1577-1589 (2003) (hereinafter Burk & Lemley).

 See, e. g., id,., at 1618; Carrier, Unraveling the Patent-Antitrust Paradox, 150 U. Pa. L. Rev. 761, 826 (2002) (hereinafter Carrier); Dreyfuss, Are Business Method Patents Bad for Business? 16 Santa Clara Computer & High Tech. L. J. 263, 274-277 (2000) (hereinafter Dreyfuss); Posner, The Law and Economics of Intellectual Property, 131 Daedalus 5 (Spring 2002).

 C. Coolidge, The Press Under a Free Government, in Foundations of the Republic: Speeches and Addresses 187 (1926).

 See also Pollack 75-76 (“Since business methods are ‘useful’ when they directly earn revenue, they are inherently unlikely to be under-produced”).

 See R. Levin et ah, Appropriating the Returns From Industrial Research and Development, in 3 Brookings Papers on Economic Activity 794-795 (1987).

 See Burk & Lemley 1618; Dreyfuss 275; see generally Carrier 821-823. Coneededly, there may be some methods of doing business that do not confer *652 sufficient first-mover advantages. See Abramowicz & Duffy, Intellectual Property for Market Experimentation, 83 N. Y. U. L. Rev. 337, 340-342 (2008).

 See Burk & Lemley 1618; Carrier 826; Olson, Taking the Utilitarian Basis for Patent Law Seriously: The Case for Restricting Patentable Subject Matter, 82 Temp. L. Rev. 181, 231 (2009).

 See Dreyfuss 276; Merges & Nelson, On the Complex Economics of Patent Scope, 90 Colum. L. Rev. 839, 873-878 (1990).

 See also Raskind, The State Street Bank Decision: The Bad Business of Unlimited Patent Protection for Methods of Doing Business, 10 Ford. Intell. Prop. Media & Ent. L. J. 61,102 (1999) (“Interactive emulation more than innovation is the driving force of business method changes”).

 There is substantial academic debate, moreover, about whether the normal process of screening patents for novelty and obviousness can function effectively for business methods. The argument goes that because business methods are both vague and not confined to any one industry, there is not a well-confined body of prior art to consult, and therefore *655 many “bad” patents are likely to issue,, a problem that would need to be sorted out in later litigation. See, e. g., Dreyfuss 268-270; Eisenberg, Analyze This: A Law and Economics Agenda for the Patent System, 53 Vand. L. Rev. 2081, 2090 (2000); Merges 589-590.

 See also J. Bessen & M. Meurer, Patent Failure: How Judges, Bureaucrats, and Lawyers Put Innovators at Risk 46-72 (2008) (hereinafter Bessen & Meurer); P. Menell & S. Seotehmer, Intellectual Property Law, in 2 Handbook of Law and Economics 1500-1501, 1506 (M. Polinsky & S. Shavell eds. 2007). Concededly, alterations in the remedy structure, such as the First Inventor Defense Act of 1999, § 4301 et seq., 113 Stat. 1536, codified at 35 U. S. C. § 273, mitigate these costs.

 See generally Farrell & Shapiro, How Strong Are Weak Patents? 98 Am. Econ. Rev. 1347 (2008); Meurer, Controlling Opportunistic and Anti-Competitive Intellectual Property Litigation, 44 Boston College L. Rev. 509 (2003); Moore, Populism and Patents, 82 N. Y. U. L. Rev. 69, 90-91 (2007).

 See Bessen & Meurer 176; Lessig, The Death of Cyberspace, 57 Wash. & Lee L. Rev. 337, 346-347 (2000).

 Congress and the courts have worked long and hard to create and administer antitrust laws that ensure businesses cannot prevent each other from competing vigorously. If methods of conducting business were themselves patentable, then virtually any novel, nonobvious business method could be granted a federally protected monopoly. The tension this might create with our antitrust regime provides yet another reason for skepticism that Congress would have wanted the patent laws to extend to business methods.